[Crim. No. 7039. In Bank. June 27, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLEY LUTHER PIKE and RICHARD D. CENICEROS, Defendants and Appellants.

Ellery E. Cuff, Public Defender, David A. Kidney and James L. McCormick, Deputy Public Defenders, Thurmond Arnold, Jr., Russell E. Parsons and Edward I. Gritz for Defendants and Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—By jury verdicts defendants Pike and Ceniceros were found guilty of first degree murder, and Pike was also found guilty of armed robbery. On the murder count the jury fixed the penalty at life imprisonment as to Ceniceros and at death as to Pike. Defendants appeal from the judgments[1] rendered accordingly and from orders denying their motions for new trial and Pike's motion to reduce the penalty to life imprisonment. The appeal by Pike is automatic. (Pen. Code, § 1239, subd. (b).)

As will hereinafter be shown, Pike took the stand and in effect made a judicial confession of his guilt of the crimes with which he is charged, and the evidence amply supports the judgment of conviction as to Ceniceros. Defendants contend that they were deprived of a fair trial by reason of a variety of asserted errors, relating principally to the denial of Ceniceros' motion for severance, the *voir dire* examination of prospective jurors, the failure to charge a conspiracy, the admission of evidence of other offenses at various stages of

---

[1] On the robbery count Pike was sentenced to state prison for the term prescribed by law.

the trial, the scope of cross-examination, the introduction of documentary evidence of a prior conviction, and alleged misconduct of the deputy district attorney in argument on the penalty phase. In the light of the whole record we have concluded that the defendants' contentions are without merit, that there was no denial of a fair trial or due process of law, and hence that the judgments should be affirmed.

By information both defendants were charged in Count I with the murder of Richard D. Kent on December 8, 1960. In Count II Pike was charged with armed robbery of Berta and Rudolph Fleischner on December 6, 1960. The information further charged Ceniceros with a prior burglary conviction and Pike with a prior conviction of attempted robbery (in Minnesota). Defendants' motions to set aside the information (Pen. Code, § 995) were denied, and each entered a plea of not guilty. Before the jury were empanelled each defendant admitted the alleged prior conviction. Ceniceros then moved to strike Count II of the information (armed robbery by Pike) or, in the alternative, to grant a severance. The motion was denied and the case proceeded to trial.

The evidence as to Count I (murder) may be summarized as follows: On the evening of December 8, 1960, Jess Arriola, manager of the Lucky Auto Supply store at 8656 South Broadway, Los Angeles, was working in his store with two salesmen, Wiley Pickett and Sylvester Hnorey. Some time between 8:15 and 8:30 p. m., Pike entered the store and was asked by Pickett if he could help him. Pike drew a gun and told Pickett to open the cash register. The latter was unable to do so and Pike threatened to shoot him. Arriola then opened the register and, under orders of Pike, began putting money into a paper bag.

Meanwhile, Los Angeles Police Officers Kent and Poor had parked their car near the store, unaware of the robbery being committed inside. While Officer Poor remained in the car Officer Kent went into the store to buy new batteries for his flashlight. As he entered he called a greeting to Arriola, whom he knew, and walked towards the four men carrying his flashlight. Pike, who had his back to the entrance, then turned to face Officer Kent and ordered him at gun point to move around a display table. Officer Kent was not in uniform, but his coat was open and Arriola and the others could see handcuffs and ammunition on his belt as he walked. Almost immediately after Officer Kent reached the place where

he had been ordered to go, Arriola heard a shot from Pike's direction and saw Officer Kent clutch his chest and begin to fall, drawing a gun as he did so. Arriola and his two employes ducked down behind the counter and heard a series of shots from Officer Kent's direction. They looked up and saw Pike running toward the front door. Officer Kent staggered after him, then fell to the floor.

Officer Poor, sitting outside in the police car, heard the shots and saw Pike run out of the store, gun in hand. The officer gave chase on foot, calling out, "Police officer, stop." Pike did not stop, and Officer Poor drew his gun and pursued him, pausing to fire a shot during the chase. Pike staggered momentarily, then ran to one of two cars parked near an alley and got into it. The officer shouted, "Get out with your hands up or I will shoot." At that point Ceniceros jumped out of the car with his hands up, saying, "Don't shoot. That crazy guy got in my car with a gun." Officer Poor ordered him to lie down in the street, then saw Pike pointing a gun at him over the top of the car. The officer dived behind the other car, hearing gunfire from Pike's direction, then saw that Pike's gun had jammed and called to him to drop it. Pike threw his gun down and surrendered. He had a minor gunshot wound in the left shoulder, for which he was subsequently treated.

After Officer Poor had handcuffed the defendants together he asked Pike, "Did you shoot that other policeman?" Pike replied that "he possibly did but he didn't mean to." Upon their return to the Lucky store Pike was identified by Arriola as the man who had shot Officer Kent during the attempted robbery. Arriola did not identify Ceniceros at the time, but at the police station that evening he recalled that Ceniceros had been "in my store looking around" either two nights before or the night before the robbery; and that when Arriola had inquired if he could help him, Ceniceros had asked for an item that was not in the store and then had left.

An autopsy established the cause of Officer Kent's death as a gunshot wound of the chest resulting in massive intrathoracic hemorrhage. A ballistics expert testified that the fatal bullet, recovered from the officer's body, had been fired from Pike's gun.

It was the prosecution's theory with respect to Ceniceros' involvement in the crime that the attempted robbery was committed pursuant to a conspiracy between the two defendants to commit such robberies, and further that Ceniceros

aided and abetted Pike in the commission thereof by "casing" each establishment before it was robbed. In support of this theory the following evidence was introduced:

As Officer Poor was returning to the Lucky store with the defendants in handcuffs, Ceniceros repeated to him that "the man had got into his car with a gun and he [Ceniceros] had not had anything to do with anything." At the police station later that night Ceniceros was asked by Officer Chiquet if he was acquainted with Pike; he replied that he was not, and that he had never seen him prior to that occasion. In response to further questioning Ceniceros said, "I told you before, this is the first time I've seen him," and "Why should I cop out to something that would send me to the gas chamber?" An overwhelming mass of evidence was adduced to show the falsity of Ceniceros' assertions in this respect.

To begin with, police officers examining Ceniceros' car, a faded blue Chrysler, discovered a billfold in the sun visor over the driver's seat containing a California driver's license in Pike's name, two Social Security cards in Pike's name, and three wads of folded banknotes. Also discovered was a sales slip from a store called Sy Devore's, made out to one "Charles Clark" and dated December 8, 1960. Under the carpet on the driver's side the police found 42 one-dollar bills, a ten-dollar bill and a five-dollar bill; under the front seat on the passenger's side the police found a holster that appeared to have been cut down to carry a small automatic weapon, and a jar containing a chalky liquid; on the floor at the right rear the police found, in an envelope marked "Naomi," a small red box containing 12 "findings"—i.e., metal clips used by jewelers to mount stones or other ornaments as earrings (People's Exhibit 67). Fingerprints of both defendants were subsequently discovered on the jar of chalky liquid.

Robert Wiggin, a garage owner, testified that on December 2, 1960, Ceniceros introduced Pike to him as "a friend"; that Pike then left his car with Wiggin to be repaired, and drove away with Ceniceros in the latter's Chrysler; and that Pike's car remained at the garage through December 8, the night of the homicide. Louise Adatto, an apartment house manager, testified that on November 25, 1960, she rented an apartment to Pike, who gave his name as "Clark"; that Ceniceros helped Pike move into the apartment with a woman and a small child; that she (Mrs. Adatto) thereafter saw Pike and Ceniceros go out together most evenings; and that between 5 and 6 p. m.

on December 8, 1960, she observed Pike meet Ceniceros in the driveway and leave in the latter's car.

Lillian Sanchez testified that she met Pike in October 1960, and that he began living with her and her daughter. She first met Ceniceros in October when he came to call on Pike at her apartment. Ceniceros returned on two other occasions during the last two weeks of October, and each time he and Pike would go behind the building and talk, out of her hearing. Around Thanksgiving she and Pike rented an apartment in the building managed by the Adattos, and Ceniceros helped with the moving. Thereafter Ceniceros came to see Pike "quite a number of times," arriving during the afternoon; both men would leave for two or three hours in the evening, usually in Ceniceros' car; at no time would the men discuss any matters in the presence of Miss Sanchez. Between 5 and 6 p. m. on December 8, 1960, Ceniceros picked up Pike in Ceniceros' Chrysler and the two men drove off; Pike did not return.

The People then introduced evidence of two robberies committed by Pike on the evening of December 8, prior to the attempted robbery of the Lucky store: (1) Ann Bledstein testified that between 7:20 and 7:30 p. m. on that day Pike entered the shoe store owned by her husband and herself, drew a gun similar to that later used to kill Officer Kent, and robbed them of the contents of the cash register and Mr. Bledstein's wallet; (2) Aaron L. Gordon testified that at about 7 p. m. on that same day Pike entered his men's store, drew a gun similar to that used to shoot Officer Kent, and robbed him of the contents of the cash register and his wallet.

The evidence as to Count II (armed robbery by Pike of Berta and Rudolph Fleischner) may be summarized as follows:[2] At approximately 6:45 p. m. on December 6, 1960, Pike entered Fleischner's variety store with a gun in his hand and directed Mr. Fleischner to empty the cash register. While the latter was complying, Mrs. Fleischner went to the front door and Pike ordered her to come back; when she did not move he held the gun to Mr. Fleischner's temple and said, "You want that I shoot your husband?" Pike then took Mr. Fleischner's wallet and ran out of the store. Mr. Fleischner pursued him, crying for help. Pike turned and fired his gun, then ran on. Mr. Fleischner returned to the store and found

---

[2] All of this testimony was limited to Pike, and the jury were so instructed.

that he had been shot in the arm. After wounding Mr. Fleischner the bullet travelled through the window of a nearby laundromat and lodged in the neck of Janet Johnson (then Janet Crowell). The latter was treated and the bullet turned over to the police. A ballistics expert testified that it had been fired from the same gun that was used to kill Officer Kent.

Ceniceros took the witness stand in his own behalf. He admitted that he had known Pike for some 60 days prior to December 8, 1960; that he met Pike while the latter was living with Miss Sanchez; that he helped them move to their new apartment (i.e., in the apartment house managed by the Adattos); that shortly thereafter he accompanied Pike to Wiggin's garage while Pike left his car there for repairs; and that there were times when he drove Pike to various places in his own car, a blue Chrysler, and times when Pike borrowed the car and drove it alone.

With respect to the events of December 8, 1960, Ceniceros admitted calling for Pike at the latter's apartment between 5:30 and 5:45 p. m., and driving off with him in the Chrysler. He testified that they first went to Sy Devore's men's store, where Pike made a down payment on a coat for Ceniceros; that after 15 or 20 minutes in Sy Devore's Pike drove them to the corner of Sunset and Silverlake; that Pike then said that he "had something to attend to," and told Ceniceros that he would pick him up there again at 8 p. m. Ceniceros testified that he then walked a short distance to his mother-in-law's house, remaining there until 7:45 p. m., and was picked up by Pike at the appointed time and place; that Pike drove to 87th Street near Broadway (where the car was found after the shooting) and got out, saying that he "wanted to get a shirt." Ceniceros testified that he waited in the car; that some time later Pike ran up, jumped into the car with gun in hand, and told Ceniceros to get the car started; and that Ceniceros subsequently got out of the car at the command of Officer Poor.

On direct examination Ceniceros denied ever having been in the Lucky store, denied having "had any discussion with Mr. Pike about his going into that store and attempting to rob it," denied having any knowledge that Pike had done so, and denied having any "arrangement" with Pike whereby he, Ceniceros, was to "wait in the car for him while he committed a hold-up." On cross-examination by the deputy district attorney, Ceniceros further denied having agreed with

Pike to commit any other robberies and denied knowing of any that Pike had committed. He admitted, however, that Pike had given him a black star sapphire ring (People's Exhibit 69) two or three weeks before December 8; that he, Ceniceros, subsequently told several people that he had bought the ring; and that sometime in November he had the ring appraised in De Luca's jewelry store by Mr. De Luca. Ceniceros further denied having seen the envelope marked "Naomi" found on the rear floor of his car (People's Exhibit 67), but admitted that he looked in the back of his car from time to time and "would have noticed anything back there."[3] Ceniceros admitted having lied to Officer Poor in telling him that he did not know Pike, and also to Officer Chiquet in reiterating that assertion several hours later; he testified that he did so because he was "very frightened" and had "a horrible feeling."

Pike took the stand in his own behalf and testified on direct examination that he attempted to rob the Lucky store on December 8, that he shot Officer Kent during that attempted robbery, and that on December 6 he robbed the Fleischner variety store and shot at Mr. Fleischner as the latter pursued him after the robbery. Pike's description of these events was substantially similar to that of the various prosecution witnesses, the principal discrepancy being his testimony that Officer Kent had fired first. On cross-examination by counsel for Ceniceros, Pike corroborated his codefendant's story of the events of December 8 and the latter's denial of any agreement between them to engage in robberies. On cross-examination by the deputy district attorney, however, Pike admitted that he took the black star sapphire ring (People's Exhibit 69) in a robbery of the Rancho Park Jewelers on November 22, 1960, and gave it to Ceniceros a day or two later; and that the latter had the ring appraised and thereafter gave him the name and address of the De Luca jewelry store. Pike further admitted that the envelope marked "Naomi" (People's Exhibit 67) was among the items that he took in a robbery of the De Luca store on November 30, 1960; and that Ceniceros' car (where Exhibit 67 was found) was used by him in committing that robbery.[4]

---

[3]The foregoing testimony relative to Ceniceros' contact with Mr. De Luca and People's Exhibits 67 and 69 was limited to Ceniceros.

[4]The foregoing testimony relative to the Rancho Park and De Luca robberies was limited to Pike.

Finally, Pike admitted that after his arrest on December 8 he told police officers that he had never seen Ceniceros prior to that night.

The principal rebuttal evidence introduced by the People was the testimony of the victims of the just-mentioned Rancho Park and De Luca jewelry robberies, as follows:

(1) Elise Costanza, a saleswoman at the Rancho Park Jewelers, testified that on November 22, 1960, Pike entered the store, drew a gun, and ordered her to fill a white cloth sack with rings and watches from the display cases and with cash from the register. Finally he said, ''That's enough. I don't have much time. My buddy's waiting for me.'' He herded the witness and several customers into a washroom and left by the back door. Miss Costanza further testified that one morning about a week or 10 days before the robbery Ceniceros entered the Rancho Park Jewelers and asked to have his watch band repaired; that ''just as soon as he gave me the watch, why, he went over to the diamond case where these rings were in and kept looking at them very intently. Then he turned and went to the opposite side of the store and near the—near the front end of the store, and was looking at our diamond pendants.'' Miss Costanza identified People's Exhibit 69, the black star sapphire ring, as one of the rings that Pike took during the robbery.

(2) Joseph C. De Luca, a jewelry store owner, testified that on November 30, 1960, Pike entered his store, drew a gun, and said, ''Let's go back to where the safe is.'' The witness testified that Pike ''seemed to know where it [i.e., the safe] was.'' Pike produced a white cloth sack and ordered Mr. De Luca to empty the contents of the safe into it. The victim complied and, at the further direction of Pike, also handed over a tray of rings from a display case. Pike, with the booty, left by the back door.

The witness further testified that on November 28, two days before the robbery, Ceniceros entered his store with another man (not Pike) and said he wanted to trade a ring for a diamond. The ring was the black star sapphire taken in the Rancho Park robbery a week earlier. Mr. De Luca showed Ceniceros several diamonds from a display case and from his safe, but Ceniceros insisted that he wanted a still bigger one, and Mr. De Luca told him to return in a few days. Ceniceros explained to Mr. De Luca that he wanted the diamond ring for his girlfriend and that he was planning on

getting married.[5] Either the next day or the day of the robbery Ceniceros returned to the store about 4 p. m. He remained in the front of the store and looked in a few of the display cases while Mr. De Luca was waiting on customers, then waved and walked out without saying anything. Mr. De Luca further testified that amongst the merchandise taken during the robbery was a quantity of jeweler's "findings" or ear clips such as were found in Ceniceros' car after the shooting (People's Exhibit 67), and that such findings were kept in envelopes bearing the name of a firm called "Naomi."

*Ceniceros' Motion for Severance.* At the outset Ceniceros contends that he was deprived of a fair trial by reason of the denial of his motion to strike Count II of the information (the Fleischner robbery) or, in the alternative, to grant a severance. The argument is that there was no showing that Ceniceros had any connection with the offense charged in Count II, and hence that the admission of evidence establishing the commission of that offense was prejudicial error as to him. ·

The contention is without merit. ▇ Section 954 of the Penal Code permits joinder of "two or more different offenses connected together in their commission. . . ." Such joinder is proper if there is "a common element of substantial importance" in the commission of the offenses. (*People* v. *Kemp* (1961) 55 Cal.2d 458, 475 [11] [11 Cal.Rptr. 361, 359 P.2d 913]; accord, *People* v. *Spates* (1959) 53 Cal.2d 33, 36 [3] [346 P.2d 5]; *People* v. *Chessman* (1959) 52 Cal.2d 467, 492 [12, 13] [341 P.2d 679].) Here it appeared that the gun with which Pike committed the armed robbery of the Fleischner store on December 6 (Count II) and with which he wounded Mr. Fleischner and Mrs. Johnson during that robbery, was the gun with which he shot and killed Officer Kent during the attempted armed robbery of the Lucky store on December 8 (Count I). ▇ Where an accusatory pleading charges separate offenses each involving the use of the same gun in their commission, the joinder has been held to be proper under section 954. (*People* v. *Scott* (1944) 24 Cal.2d 774, 778-779 [5] [151 P.2d 517]; *People* v. *Walker* (1952) 112 Cal.App.2d 462, 471 [4] [246 P.2d 1009].) Section 1098 of the Penal Code provides for the joint trial of "two or more defendants ... . jointly charged with any public offense . . . unless the court order separate trials." ▇ Ceniceros was

---

[5]Ceniceros had been married since the previous May.

jointly charged with Pike in Count I; and the fact that he was not also charged with the robbery alleged in Count II "does not render the joinder improper or deprive the court of discretion to deny a motion for severance since there is a joint charge as to one of the crimes and a common element of substantial importance in the commission of all of them." (*People* v. *Chapman* (1959) 52 Cal.2d 95, 97 [1] [338 P.2d 428], and cases there cited.) No abuse of discretion is shown in the denial of Ceniceros' motion for severance.[6]

Nor is prejudice shown to have resulted to Ceniceros by admission of the evidence relative to Count II. ▮ Ceniceros simply states that he "was prejudiced" by such evidence, but "A bald assertion of prejudice is not enough." (*People* v. *Kemp* (1961), *supra*, 55 Cal.2d 458, 477 [14].) ▮ Here the jury were repeatedly admonished to consider the subject evidence only with respect to the offense charged against Pike in Count II (*ante*, fn. 2) and in the absence of a strong showing to the contrary it is to be presumed that such instructions sufficiently protected Ceniceros' right to a fair trial. (*People* v. *Santo* (1954) 43 Cal.2d 319, 332 [19] [273 P.2d 249].)

▮ *Voir Dire Examination of Prospective Jurors.* Both defendants contend that the *voir dire* examination was conducted by the deputy district attorney in such a manner that the jurors selected "felt that they were committed to a death penalty." Defendants concede that "a prosecutor in a case where the death penalty may be imposed clearly has the right to ascertain the views of the potential jurors [citations] so that he can intelligently exercise his challenges against those whose consciences would preclude them from imposing this penalty. [Citations.]" (*People* v. *Wein* (1958) 50 Cal.2d 383, 394 [1] [326 P.2d 457].) Defendants argue, however, that in the case at bench the prosecutor abused this right and thus deprived them of a fair trial.[7]

The record does not bear out this assertion. A representative sample of the subject *voir dire* examination is set forth in the footnote.[8] From statements and questions such as these the

[6]*People* v. *Davis* (1940) 42 Cal.App.2d 70 [108 P.2d 85], relied on by Ceniceros, is distinguishable for the foregoing reasons.

[7]Since Ceniceros was not given the death penalty his standing to complain of the conduct of the deputy district attorney in this connection is questionable at best.

[8]In addressing the entire panel of prospective jurors the deputy district attorney stated that "I attempt by these questions to have them [i.e., the jurors] look forward several weeks when they are faced with it.

prospective jurors could not reasonably have concluded that they were in any way "committed" to imposing the death penalty. The deputy district attorney simply made it clear by such language that although each prospective juror had declared himself to be not opposed to capital punishment in theory, each should also consider whether he could bear the responsibility of actually condemning the defendants to death in the event that, in the exercise of his absolute discretion as a juror and on all of the evidence introduced at the penalty phase, he were to conclude that the proper penalty was death. Such a realistic line of inquiry falls well within the scope of the prosecutor's discretion in conducting his *voir dire* examination. ■ Defense counsel is, of course, entitled to equal scope in ascertaining that prospective jurors can serve with like fairness to the defendant. ■ As we

---

Because it is one thing to hear me ask questions here now and another to two or three weeks hence be under the gun and called upon when I may safely say, if it gets to that stage, I will urge on the evidence, what I believe the proper penalty. . . . I try to make you look forward to what you can expect me to urge based upon the evidence, giving consideration to all of the things I have mentioned: background and history, evidence in mitigation and aggravation, and circumstances surrounding the offense.

"Now, when I question you here, I am trying to make you look forward several weeks, that's all I am trying to do. I know you have all said you are not opposed to capital punishment. But if anyone during my questioning here or afterwards, if counsel questions other jurors, if you feel otherwise, or feel that you do not want to participate in such a verdict, I expect you to let me know by raising your hand, because I say through experience that jurors have on occasion stated they are not opposed to capital punishment in a proper case, but that they themselves did not wish to participate in the return of such a verdict with other jurors."

Typical of the questions asked on *voir dire* in this connection is the following:

"MR. LEAVY: [deputy district attorney]: And did you feel I pretty well declared myself on behalf of the prosecution here as the deputy district attorney representing the People of the State of California as to what position I would take, based upon the evidence, if and when the occasion arose, and you sat as a juror concerning the penalty? MR. PITTENGER [a prospective juror]: Yes, sir.

"MR. LEAVY: You don't feel I was in any way equivocal in what position I said I felt would make [sic], did you? MR. PITTENGER: Not in my opinion. . . .

"MR. LEAVY: Very well. And you feel that you, too, would be willing to return with eleven other jurors if it was a proper case, all the evidence you had heard? MR. PITTENGER: Yes, sir.

"MR. LEAVY: And in your sound judgment, and discretion, that the proper penalty was the penalty of death as to either or both defendants, you would be willing to return it to this courtroom and with eleven other jurors tell the defendants they are condemned, under the law of the State of California, to death? You would be willing to accept that responsibility? MR. PITTENGER: Yes, sir."

said in *People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [1-3] [17 Cal.Rptr. 617, 367 P.2d 33], ''It is clear . . . that counsel for a defendant in a capital case has the right to question the prospective jurors on *voir dire* for the purpose of ascertaining whether any would vote to impose the death penalty without regard to the evidence in the event of a conviction. While a challenge on that ground is not specifically provided for in section 1074 of the Penal Code (implied bias), section 1073 permits a challenge for actual bias 'For the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, . . .' The entertaining of an immutably established opinion in favor of invariably selecting the death penalty in any case where the offense charged is punishable at the discretion of the jury either by death or imprisonment is such a 'state of mind . . . which will prevent [the juror] from acting with entire impartiality and without prejudice. . . .' '' Penal Code section 1074 provides that ''If the offense charged be punishable with death'' a challenge for bias may be taken as to a prospective juror for ''the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror.''

 Here defense counsel had previously questioned the prospective jurors with a view to determining the ability of each to vote for life imprisonment rather than the death penalty if the evidence should warrant the lesser punishment, and the prosecutor appears merely to have performed his duty to ascertain that prospective jurors were not disqualified within the purview of section 1074.

 Pike further complains that the deputy district attorney in effect committed each juror to violate his sworn duty to express his individual conviction in determining the penalty. But it is apparent that the deputy's reference to ''participating'' with eleven other jurors in a verdict of death was merely a manner of phrasing intended to emphasize the potential responsibility involved, and it would be unreasonable to assume that the jurors understood it otherwise. As obviating any such possibility, we further observe that the jury were specifically instructed on the penalty phase that ''Your verdict must express the individual opinion of each juror.''

 Pike also argues that in making the above-quoted statements the deputy was expressing his personal opinion as

to the proper penalty based upon evidence not produced in court, and that this is improper under such cases as *People* v. *Love* (1961) 56 Cal.2d 720, 730 [19] [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], and *People* v. *Kirkes* (1952) 39 Cal.2d 719, 723 [1] [249 P.2d 1]. But those (and other similar) decisions are not relevant, as each deals with expressions of opinion voiced by the prosecutor during closing argument on the guilt or penalty phase—i.e., after all of the evidence was in. Here the prosecutor simply told the prospective jurors, as a preface to his above described line of inquiry, that on the basis of what he anticipated the evidence yet to be presented would show, he expected to ask for the death penalty should the trial reach that stage. Such a forthright disclosure is commendable rather than improper.

Finally, it is observed that neither defendant made timely objection to the subject statements and questions of the deputy district attorney, and hence they "cannot now complain for the first time as, upon objection, any danger that the jury might have misunderstood their duty could have been corrected by proper instructions." (*People* v. *Wein* (1958), *supra,* 50 Cal.2d 383, 395 [4].)

*Failure to Charge a Conspiracy.* Ceniceros complains that he was denied a fair trial in that, while no conspiracy was charged in the information, evidence was admitted against him of offenses, acts, and statements by Pike under the theory that he and Pike conspired to commit a series of robberies which culminated in the crimes of December 8, 1960. In these circumstances, however, a conspiracy need not be pleaded in the indictment or information if the evidence actually shows the existence of one. (*People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [22] [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Davis* (1957) 48 Cal.2d 241, 250 [11] [309 P.2d 1]; *People* v. *Tanner* (1935) 3 Cal.2d 279, 299 [7] [44 P.2d 324]; *People* v. *Wells* (1960) 187 Cal.App.2d 324, 329-330 [12] [9 Cal.Rptr. 384].) On the evidence hereinabove summarized, implicating Ceniceros in the planning and execution of the various robberies carried out by Pike, the jury could reasonably have inferred the existence of a conspiracy between these defendants to commit the crimes with which they are charged. (Pen. Code, § 31.)

Nor is any element of surprise or unfairness shown to have resulted from the People's election to refrain from adding a separate count charging the crime of criminal conspiracy. Ceniceros was well aware, before going to trial, that

the case against him was based on theories of conspiracy and aiding and abetting. At the preliminary examination the prosecution introduced evidence tending to establish the principal facts hereinabove summarized; at the same time Ceniceros was held to answer to a complaint charging him and Pike with commission of the Rancho Park and De Luca robberies;[9] and in opposing Ceniceros' motion for severance at the start of trial in the case at bench the deputy district attorney left no doubt that he would "ask this Court to apply the law of conspiracy to prove that the murder which they are on trial for was the result of the conspiracy that they had entered into to commit robberies."[10]

▪ *Evidence of Other Offenses as Part of the People's Case in Chief.* Pike contends that the court erred in allowing the People to introduce, as part of their case in chief, evidence that he committed the Bledstein and Gordon robberies. He complains that the latter offenses were not charged in the information, and hence that the admission of evidence relating thereto deprived him of a fair trial. The subject evidence, however, was not offered to show a general criminal disposition, but to establish that armed robberies were committed by Pike while the two defendants were together in Ceniceros' car, shortly before the attempted armed robbery of the Lucky store and the shooting of Officer Kent. The evidence "tends logically and by reasonable inference" to establish that fact (*People* v. *Riser* (1956) 47 Cal.2d 566, 578 [10] [305 P.2d 1]), and hence was admissible to show the common design of the criminal enterprise undertaken by the defendants. (*People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [10] [323 P.2d 427]; *People* v. *Carter* (1961) 192 Cal.App.2d 648, 660 [7a-7b] [13 Cal.Rptr. 541]; *People* v. *Bompensiero* (1956) 142 Cal.App. 2d 693, 707-708 [6] [299 P.2d 725].) The jury were adequately instructed in this regard (CALJIC No. 33).

*Scope of Cross-Examination.* Both defendants contend that the court erred in allowing the deputy district at-

---

[9]In a companion case Pike was held to answer to a complaint charging him with commission of the Bledstein and Gordon robberies. Both of the latter cases (L.A. 237706 and L.A. 237709) were ordered off calendar on August 10, 1961, pending the determination of the present appeal.

[10]The jury were instructed that "the defendants . . . are not charged in the Information in any count with the offense of conspiracy. However, the prosecution has offered evidence as part of its case in an attempt to prove and for the purpose of showing that the defendants . . . were acting in concert and in furtherance of a conspiracy to commit a series of criminal acts, to wit, robberies. For this reason the Court will give you instructions concerning the law of conspiracy."

torney to cross-examine Ceniceros with respect to the latter's knowledge of and contact with the Rancho Park and De Luca stores during the month of November 1960, and his knowledge of and contact with People's Exhibits 69 (the black star sapphire ring) and 67 (the ear clips).[11] It is urged that the cross-examination was improper because insufficiently related to matters brought out on direct examination of Ceniceros.

The contention is without merit. Section 1323 of the Penal Code provides in relevant part that if a defendant "offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief." As we explained, however, in *People* v. *Zerillo* (1950) 36 Cal.2d 222, 228 [4]-229 [7] [223 P.2d 223], "This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. [Citations.] It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on direct examination. [Citations.] . . . If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide. [Citations.] Moreover, as stated in *People* v. *Teshara*, 141 Cal. 633, 638 [75 P. 338], 'A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states.' " (Accord, *People* v. *Weiss* (1958) 50 Cal.2d 535, 561 [16] [327 P.2d 527]; *People* v. *Watson* (1956) 46 Cal.2d 818, 832 [9] [299 P.2d 243].)

Tested by these rules, the subject cross-examination was proper. Ceniceros took the stand and made "a general denial of the crime with which he is charged." Moreover, as noted above, on direct examination he specifically testified (1) that he had never been in the Lucky store managed by Jess Arriola; (2) that he had never had any discussion with Pike concerning an attempt to rob it; (3) that if in fact Pike did attempt to rob the store he knew nothing about it; and

[11]As the subject testimony was expressly limited to Ceniceros (*ante*, fn. 3), Pike cannot complain of any alleged impropriety therein.

(4) that he had no arrangement with Pike whereby he, Ceniceros, was to wait in the car for Pike while the latter carried out the robbery. The clear impact of this testimony was to assert that the defendants' association was and had at all times been a wholly innocent one. It was therefore not improper to allow the prosecutor to question Ceniceros with respect to the latter's knowledge of and connection with the other offenses committed by Pike, as such inquiry tended to overcome or qualify the effect of Ceniceros' testimony on direct examination. (See also *People* v. *Tarantino* (1955) 45 Cal.2d 590, 599 [12] [290 P.2d 505]; *People* v. *Henderson* (1956) 144 Cal.App.2d 706, 711 [2] [301 P.2d 468], and cases there cited.)

Ceniceros further complains of cross-examination relating to a handcuff key which was part of People's Exhibit 61, a ring of keys found in his car after his arrest. Ceniceros acknowledged that the handcuff key was his, but explained that he had found it and kept it as a novelty piece. The matter was not pursued. Since the key was found in Ceniceros' car, which figured prominently in the case, it was not improper under the circumstances to inquire briefly into its origin and purpose.

 Pike complains of cross-examination relating to his knowledge of the origin of People's Exhibit 67 (the ear clips). The objection to that inquiry apparently was intended to include all cross-examination of Pike relating to the Rancho Park and De Luca robberies. Previously, however, Pike had testified on cross-examination by Ceniceros and had corroborated the latter's story in every material respect. For the reasons given above, the People's cross-examination of Pike with respect to the circumstances surrounding the Rancho Park and De Luca robberies was not improper as it tended to overcome or qualify the implication of innocent association suggested by the just-mentioned testimony.

 *Evidence of Other Offenses in Rebuttal.* Defendants contend that the court erred in allowing the People to introduce as rebuttal evidence the testimony of the victims of the Rancho Park and DeLuca robberies. The argument is that if evidence of the latter robberies was admissible at all, it was properly part of the People's case in chief rather than rebuttal; and hence that under the rule of *People* v. *Carter* (1957) 48 Cal.2d 737, 753 [16]-754 [19] [312 P.2d 665], the admission of such evidence after the defense had rested was error and deprived defendants of a fair trial.

This contention is closely related to the preceding point, and is equally without merit. The factual complexion of the case before us is materially different from that of the *Carter* case. In *Carter* a red cap, found in a slough with the murder victim's empty wallet and a wrench owned by the defendant, was introduced in rebuttal and connected to the defendant by means of a microscopic examination of hair. We were of the opinion (*id.* at p. 754 [19] of 48 Cal.2d) that the cap should have been put in as part of the People's case in chief because it was "crucial evidence tending to show that defendant had put the wallet and wrench in the slough and therefore had beaten and robbed [the victim]." In the case at bench the evidence of the Rancho Park and De Luca robberies was not "crucial" nor was it directly probative of the crimes charged. The deputy district attorney introduced a substantial mass of testimony and exhibits as his case in chief in support of his announced theories of conspiracy and aiding and abetting; he was not required, in exercising his right to control the conduct of the prosecution, to introduce the subject evidence as well. In the course of the above discussed cross-examinations, however, both Ceniceros and Pike testified that there had never been any agreements between them to commit any unlawful acts whatever. The deputy district attorney was not bound to accept these self-serving and exculpatory assertions at their face value but could properly introduce the subject evidence for the specific purpose of impeachment. (*People* v. *Wein* (1958), *supra*, 50 Cal.2d 383, 407 [35]; *People* v. *Westek* (1948) 31 Cal.2d 469, 476 [5]-478 [6] [190 P.2d 9]; *People* v. *Hoffman* (1926) 199 Cal. 155, 162 [6] [248 P. 504].) This being so, it is immaterial that the impeaching evidence also tended—as by its nature such evidence often does—to support the People's case in chief (*People* v. *Mayfield* (1961) 196 Cal.App.2d 72, 75 [4] [16 Cal.Rptr. 261]; *People* v. *Mackey* (1959) 171 Cal.App.2d 513, 516-517 [1] [340 P.2d 688]; cf. *People* v. *Nye* (1951) 38 Cal.2d 34, 39 [5] [237 P.2d 1]), or that it tended to connect the defendants with crimes (the Rancho Park and De Luca robberies) other than those for which they were on trial (*People* v. *Atkins* (1958) 163 Cal.App.2d 732, 737 [4] [329 P.2d 939]; *People* v. *Jackson* (1957) 152 Cal.App.2d 397, 404-405 [6] [313 P.2d 931], and cases there cited).[12]

---

[12]On the latter point it will be remembered that during cross-examination Pike had judicially confessed to committing both the Rancho Park and De Luca robberies.

 Nor does it appear that the admission of the subject evidence in this particular order deprived defendants of a fair trial. The order of proof rests largely within the discretion of the trial court. (Pen. Code, §§ 1093, subd. 4, 1094; Code Civ. Proc., § 2042; *People* v. *Wein* (1958), *supra*, 50 Cal.2d 383, 407 [36]; *People* v. *Carter* (1957), *supra*, 48 Cal.2d 737, 754 [20].) The contention here discussed was raised by appropriate objections and motions to strike and to declare a mistrial, and was argued at considerable length before the trial court. In making its ruling the court stated, ''Now, I have carefully studied the motions, the arguments, the evidence and the legal authorities for all of yesterday, last night and early this morning. . . . It is my best judgment that so far the trial has not been unfair to either the defendant Pike or the defendant Ceniceros, that the motions should be denied, and that is the ruling of the Court.'' Defendants fail to show that this careful and deliberate disposition of the matter amounted to an abuse of the court's discretion.

*Introduction of Documentary Evidence of Pike's Prior Conviction.* As noted earlier, both defendants were charged in the information with prior felony convictions, and both admitted the priors at the start of trial and out of the presence of the jury. Pike contends that the court erred in allowing the deputy district attorney, at the close of his cross-examination, to introduce documentary evidence of Pike's prior conviction (attempted robbery in Minnesota) without first asking him whether he had been convicted of a felony.

The contention is unavailing. Section 2051 of the Code of Civil Procedure provides, with respect to impeachment by proof of prior conviction, that ''it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony. . . .'' A defendant who chooses to take the witness stand in a criminal action thereby subjects himself to impeachment in the same manner as any other witness, including impeachment by proof of a prior felony conviction. The rule is not different where the defendant has admitted the prior conviction out of the presence of the jury in pleading to the indictment or information, notwithstanding the provisions of section 1025 of the Penal Code.[13] (See, e.g., *People* v. *Jackson* (1959) 53 Cal.2d 89, 93 [3] [346 P.2d 389]; *People* v. *Cobb* (1955) 45 Cal.2d 158,

[13]Penal Code section 1025 provides in relevant part that ''In case the defendant pleads not guilty, and answers [in pleading to a charged

162-163 [8] [287 P.2d 752] ; *People* v. *Garcia* (1959) 174 Cal. App.2d 525, 532-533 [11] [344 P.2d 855.]) It has been said that "The usual manner of making proof of a prior conviction is to ask the witness who has suffered such a conviction if he has been theretofore convicted of a felony, and if he denies that he has been so convicted, to produce a copy of the judgment of conviction; or if he answers in the affirmative he may then be asked of what specific crime he was convicted." (*People* v. *Craig* (1925) 196 Cal. 19, 28 [5] [235 P. 721].) Here that more ordinary practice was not followed, but the course taken was not in violation of any rule of evidence. There is no statutory directive as to selection of procedure in this respect; section 2051 simply designates alternative means of proof. In any event, at the time of the admission of the documentary proof of the prior conviction Pike had already made his detailed judicial confession of guilt of the crimes for which he was on trial, and hence could not possibly have been injured by the ruling.[14]

 *Evidence of Another Offense on the Penalty Phase.* Pike next complains that the court erred in allowing the People to introduce evidence of the commission by Pike of the offense of pimping, after he had rested his case on the penalty phase. Pike argues that the offense does not involve violence and hence was irrelevant to any issue on the penalty phase; and that in any event the evidence establishing it was properly part of the prosecution's case in chief rather than rebuttal.

The argument is untenable. During the taking of evidence on the penalty phase Pike called to the witness stand several members of his family who testified that he had been "very close" to his father, that his father had had heart trouble and had died in June 1960, that Pike "was hurt very badly" by his father's death, that he seemed different thereafter and was "very moody." The impact of this and similar testimony was to explain Pike's criminal propensities as being an outgrowth of a personality change brought about by his grief over his father's death. The evidence offered by the People tended to rebut that implication by showing that Pike was involved in criminal undertakings as early as May 22, 1960

---

prior conviction] that he has suffered the previous conviction, the charge of the previous conviction must not be read to the jury, nor alluded to on the trial."

[14]The evidence of the prior conviction, of course, was admissible on the penalty phase.

(the date of his arrest on a charge of pimping), i.e., even while his father was suffering from a serious heart condition. Such evidence was relevant to the issue of the "background and history" of the defendant (Pen. Code, § 190.1), and hence was proper rebuttal under the authorities cited hereinabove.

*Argument on the Penalty Phase.* Pike contends that in three instances the deputy district attorney referred in argument on the penalty phase to facts not in evidence.

First, Pike points to a reference in argument to the death penalty's being a deterrent and to the fact that some criminals carry toy or unloaded guns through fear of incurring that penalty. This language, it is urged, brings the case within the holding of *People* v. *Love* (1961) 56 Cal.2d 720, 732 [23a] [17 Cal.Rptr. 481, 366 P.2d 33, 809].[15] Examination of the transcript, however, reveals that in making the subject remarks the deputy was replying to matters first raised by defense counsel, who had stated at length their personal opinions and the asserted opinions of various other persons to the effect that the death penalty was not truly a deterrent.[16] More importantly, the transcript also reveals that the deputy made it clear to the jury that he was not asking for the death penalty because he thought it was a deterrent to others but because he believed that the evidence fully warranted it in the present

---

[15]It is noted that the argument on the penalty phase in the case at bench took place on July 19 and 20, 1961, and that the decision in *People* v. *Love, supra,* was filed on November 2, 1961.

[16]Counsel for Pike, for example, argued to the jury that "none of you, I am sure, would want to execute a man just for the sake of executing him, if any good could come out of the execution of this man, if it were a deterrent to others, it might be worth it. Yes, that is what I am saying, it might be worth it. But the facts have shown in the past, ladies and gentlemen, that the execution of this man, as well as the execution of many other men, does not deter killings in the future. As a matter of fact, evidence shows that as violence increases, the greater the number of people are executed, the more crime breaks out." Counsel then proceeded to quote several passages from a writing by one Albert Camus assertedly demonstrating that the death penalty is not a deterrent, and commented, "How true that is. If this would deter, there I have cited cases to you of men that have been killed in the gas chamber for slaying police officers, for other reasons. And yet we pick up our daily papers, and there is almost a murder of the day splashed across the front pages, more police officers than ever, more husbands and wives, more vicious slayings of all kinds. And we are killing, we are executing, the gas chamber is working harder and harder than ever. And the forces keep going harder and harder the other way."

Similarly, counsel for Ceniceros quoted from a writing purportedly authored by Warden Lawes wherein the view is advanced that capital punishment is not a deterrent.

case.[17] The major portion of his argument was then devoted to analyzing that evidence in the customary manner. It follows that his reference to the deterrent effect of the death penalty was at most a minor part of his argument and must be deemed nonprejudicial under article VI, section 4½ of our Constitution. (*People* v. *Imbler* (1962) 57 Cal.2d 711, 717-718 [10] [21 Cal.Rptr. 568, 371 P.2d 304]; *People* v. *Garner* (1961) 57 Cal.2d 135, 156 [23] [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Lane* (1961) 56 Cal.2d 773, 787 [16] [16 Cal. Rptr. 801, 366 P.2d 57].)

The second alleged instance of improper argument by the deputy district attorney is the following remark: ''Mr. Kidney [deputy public defender, representing Pike] gave you the story about the guillotine, some reaction by someone who had witnessed it. I don't know whether he is trying to frighten you or not. But I again remind you that Pike at 10:45 or 11:00 o'clock the night of December 8th, after he knew he had killed Richard Kent, Pike had normal blood pressure.[18] I don't think there is a single person on the jury

---

[17]Thus, the deputy stated in part that ''Mr. Kidney [counsel for Pike] and Mr. Parsons [counsel for Ceniceros] have argued to you about deterrents for crime. They attempted to argue to you that capital punishment is not a deterrent; we still have homicide.

''My approach to this problem of what is a proper penalty in a case such as this is a little different than some of the people who speak or write upon it. Maybe it is through my experience. But I have had my share of it. I never ask a jury—first of all, I am not allowed to, but I wouldn't—I never ask a jury to impose capital punishment on a defendant to deter others, to warn others. I never do that. The law doesn't allow me to do it, and you shouldn't do it, and I don't ask you to do it in this case. It wouldn't be fair. Because I am sure the other fellows who go out and commit murder may never have heard of Pike and Ceniceros, and what penalty you impose. . . .

''I call those things to your attention because I have leveled with you folks from the beginning. I told you I had taken a position. You know what the evidence is now. I told you that the evidence is even more forceful than I anticipated, and I still maintain the same position. I don't ask you to impose capital punishment for a deterrent. I ask you as the law now permits, since September of 1957, looking at the background and history of these men, the circumstances under which this offense was committed, the fact that they were in a scheme and plan and went in with their eyes open, putting guns on people, shooting at, two people in two instances that we know of, fully aware what each other —not an impulsive thing cooked up in a bar, 'Okay, Charley, let's go out and commit a robbery.' A thing that has been going on between these men, who have had a chance to discuss, who made several successful robberies, took the loot of it, in some way split it, but you have men on background and history, circumstances of the offense, all things considered, as I have told you.''

[18]Dr. Mandell, who examined Pike between 10:21 and 11:41 p.m. on the night of the killing, had testified that his blood pressure was normal at that time.

who would have had normal blood pressure many hours after you might have unfortunately, with your own automobile, accidentally run down a pedestrian, even if it was the pedestrian's own fault.'' The remark, however, was prompted by the above mentioned argument of Pike's counsel drawn from a writing by one Albert Camus (*ante,* fn. 16). The deputy immediately explained that ''I just point out those things to emphasize the kind of people you are dealing with here, all things considered, the circumstances of the offense, their background and history.'' The matter was not pursued. Moreover, no objection was interposed by either defendant, and the jury were properly instructed that statements of counsel concerning the facts must not be regarded as evidence.

The third and final alleged instance of impropriety in argument is predicated on the deputy district attorney's remark to the effect that it is the duty of defense counsel, ''regardless of what they think of their client's testimony, to do the best they can with it,'' and that a lawyer in a criminal case could ethically allow (but could not advise) his client to testify falsely. The first part of that remark is a correct statement of the law when made, as it was here, in explanation of section 6068, subdivision (c), of the Business and Professions Code[19] (*In re Atchley* (1957) 48 Cal.2d 408, 418 [3] [310 P.2d 15] ; *People* v. *Davis* (1957) 48 Cal.2d 241, 256-257 [21] [309 P.2d 1]) ; but it is manifestly incorrect, indeed, repugnant to the duty declared, to infer therefrom that counsel may knowingly allow[20] a witness to testify falsely, whether he be a criminal defendant or otherwise (Bus. & Prof. Code, § 6068, subd. (d) ; *People* v. *Davis* (1957), *supra,* at p. 257 [23] of 48 Cal.2d). The remark is not to be condoned but, as affecting the issue before us, we are bound to note that it was made in response to the equally erroneous statement by the deputy public defender (counsel for Pike) that ''I would resign my office first [rather] than do such a thing, I would never ask that a man's life be pardoned [i.e., spared by the

---

[19]Business and Professions Code section 6068 provides in relevant part: ''Duties as an attorney. It is the duty of an attorney: . . .

''(c) To counsel or maintain such actions, proceedings or defenses only as appear to him legal or just, except the defense of a person charged with a public offense; . . .''

[20]It is to be remembered that a person cannot accurately be said to ''allow'' that which he cannot prevent. (*People* v. *Forbath* (1935) 5 Cal.App.2d Supp. 767, 769-771 [1, 2, 3] [42 P.2d 108]; *Brodsky* v. *California State Board of Pharmacy* (1959) 173 Cal.App.2d 680, 686 [3] [344 P.2d 68].)

jury] if I thought for a moment that he was a death penalty matter.'' When the latter statement was made the deputy district attorney interposed the following objection: ''Now, I don't think that's quite a correct statement of the law. I am not going to call attention to it at this time, if the Court please, but I do want to understand that I have a chance to reply to this.'' The court granted him permission to do so, and it is apparent from the context of this exchange that the jury could not reasonably have understood the subject remarks to constitute anything but a general discussion, apart from the merits of the present case, of what the deputy public defender and the deputy district attorney conceived were the duties of a defense counsel. The discussion was not protracted; and while any erroneous statement of law contained therein (none of which, it bears emphasis, related to the duties of the jury) could easily have been corrected by prompt instruction, no request for such an instruction was made by either defendant. In the circumstances the point is without merit. (See *People* v. *Wein* (1958), *supra,* 50 Cal.2d 383, 396 [8-9]; *People* v. *Sampsell* (1950) 34 Cal.2d 757, 763 [2]-765 [3] [214 P.2d 813].)

For the reasons above stated the judgments and orders appealed from are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., and White, J., concurred.

Appellants' petition for a rehearing was denied July 27, 1962.