571 P.2d 286

**The STATE of Arizona, Appellee,**

v.

**Jeffrey WIRTANEN, Appellant.**

**No. 2 CA–CR 1000.**

Court of Appeals of Arizona, Division 2.

June 9, 1977.

Rehearing Denied July 22, 1977.

Review Granted Sept. 15, 1977.

Stephen D. Neely, Pima County Atty. by D. Jesse Smith, Deputy County Atty., Tucson, for appellee.

Robert A. Hershey, Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant was convicted by a jury of conspiracy to commit armed robbery and attempted armed robbery. He was sentenced to five years probation upon the condition that he serve one year in the Pima County Jail.

Testimony at trial revealed that three people were involved in the attempted robbery—appellant, who was a friend of the victim; Robert Craft, with whom appellant shared a room at the time; and Elliott Gurnstein who was providing information to police in hopes of "working off" a previous narcotics charge.[1]

Gurnstein testified that Craft approached him about driving a "getaway car" for an armed robbery. Craft told him he had information from an "inside man" who "had the run of the [victim's] house." Gurnstein informed the police about the proposed robbery and was advised to cooperate with Craft. He testified he went with Craft several times to check out the residence and look over the premises. On the night of the robbery, Craft told Gurnstein that the victim, William Walker, ran a swap meet and kept large sums of money in the house over the weekend. Craft also mentioned there would be diamond rings and turquoise in the house.

According to Gurnstein, he and Craft made an initial attempt to rob Walker at approximately 10:00 p. m. on Sunday, April 18, 1976. Gurnstein remained in the car while Craft approached the residence. Something frightened Craft, however, and he returned to the car saying they would try again later. He then asked Gurnstein to take him home and pick him up around 1:00 a. m.

When Gurnstein arrived at approximately 1:15 a. m., Craft and appellant approached the car. Craft wanted Gurnstein to give appellant a ride but Gurnstein initially refused because the police had instructed him not to take anyone along that they did not know about. Gurnstein testified that a discussion followed during which appellant stated:

"I'm the inside man, I set this up, I know the Walkers and everything that's involved and I need to go down to the Doubletree Inn, so go down Broadway and leave me off."

Gurnstein then allowed appellant to get in the car. According to Gurnstein's testimony, as they drove down Broadway, appellant stated that he wanted his share but he did not want the Walkers hurt. Gurnstein dropped off appellant at Alvernon and Broadway. He and Craft then proceeded to the Walker residence where the police arrested Craft when he knocked on the door armed with a rifle. Appellant was later arrested when he returned to the residence he shared with Craft.

Appellant took the stand and testified that although he had inadvertently supplied information about the Walkers to Craft, he did not know that it would be used to commit a robbery. He further testified that when he learned of the robbery plans as he rode down Broadway with Gurnstein and Craft in the early morning hours of May 19, he tried to talk them out of it. He denied ever saying that he was the inside man.

On appeal, appellant claims the trial court erred in allowing the state to cross-

---

1. Gurnstein's previous narcotics charge resulted from information provided to police by Robert Craft who at that time was "working off" a charge of his own.

examine him as to other offenses. The cross-examination elicited appellant's admission that he got out of the car at Broadway and Alvernon to go to the Doubletree Inn where he hoped to use some pass-keys to enter rooms. The court ruled on appellant's motion in limine that the state could not present testimony concerning the Doubletree incident in its case in chief but that if appellant testified he was attempting to withdraw from the planned robbery, the evidence might be admissible as rebuttal.

On direct examination, appellant testified:

"Q. Was there ever any mention in the car, Jeff, about money?

A. No.

Q. Was there ever any mention about what you were going to get out of this?

A. No.

Q. Did they ever ask you if you wanted to go along?

A. No.

Q. What happened?

A. Well, I kept repeating to Bob, you know, trying to pound it into his head this was crazy. And I told him, several times, he probably would get shot right in the back as he was running away from the police.

Q. What happened after that?

A. We approached Broadway and Alvernon, and I said let me out here.

Q. All right. Did you get out of the car?

A. I got out of the car."

On cross-examination the court overruled objections by appellant's counsel and allowed the state to question appellant about his reasons for leaving the car. This exchange took place:

"Q. Where were you going?

A. I was going to Broadway and Alvernon.

Q. What for?

MR. ALPERT: Objection.

THE COURT: Overruled, you may answer.

A. (By the witness) I was going to the Doubletree Inn.

MR. LINGEMAN:

Q. What for?

MR. ALPERT: Objection.

THE COURT: Overruled.

A. (By the witness) I had a couple of passkeys and I was going—on Friday they wouldn't accept my plasma at the blood bank, they tested my plasma, and I did not have any money, and I hadn't eaten since—maybe Friday morning. And I was going to the Doubletree Inn to attempt to go into a room and see if I could find anything. I had two keys, two different rooms at the Doubletree. I went up on the second level where these keys were—the keys to these rooms were at. And on getting to the second level I found sitting outside a door several plastic room service trays with the—the people had—you know, just picked out at the food and just set them back outside to be moved. One tray was not even touched, and I ate the hamburger and the french fries on that tray. I ate a couple other hamburgers that had been half eaten, or whatever, and then I left and went back to Broadway and Alvernon and hitchhiked back to South 4th.

Q. So, in other words, you got out of the car at Broadway and Alvernon, and that's where you wanted to go from the start?

A. Yes.

Q. You didn't get out of the car because you knew this robbery was going on and that scared you or bothered you?

A. No, I'm not maintaining that, no."

Appellant contends that this evidence of intent to commit other criminal acts was inadmissible and that its admission over objection constituted reversible error. We do not agree.

██ Although evidence of other crimes is usually inadmissible, it may be offered to establish motive, intent, absence of mistake or accident, identity and a common scheme or plan. *State v. Tostado*, 111 Ariz. 98, 523 P.2d 795 (1974). When appellant voluntarily testified in his own defense, denying any guilty involvement in the robbery conspiracy and stating further that he tried to

convince the others not to commit the robbery, he placed in issue his motives and intent. The evidence regarding his reason for leaving the car was admissible therefore, to overcome or qualify the effect of his direct testimony and to negate any inference that his leaving the car was a withdrawal from the conspiracy. *People v. Schader*, 71 Cal.2d 761, 80 Cal.Rptr. 1, 457 P.2d 841 (1969); *People v. Pike*, 58 Cal.2d 70, 22 Cal.Rptr. 664, 372 P.2d 656 (1962). The present case is thus somewhat analogous to other cases in which our Supreme Court has held such evidence admissible where the defendant puts intent in issue. See e. g. *State v. Tisnado*, 105 Ariz. 23, 458 P.2d 957 (1969) (defendant claimed he had possession of narcotics only because he was in the process of removing it from the premises); *State v. Vallejos*, 89 Ariz. 76, 358 P.2d 178 (1960) (defendant claimed entrapment). See also *State v. Dayley*, 96 Idaho 527, 531 P.2d 1172 (1975).

Appellant's second contention on appeal is that there was insufficient evidence to convict him. When the sufficiency of evidence is questioned, we must determine whether substantial evidence exists to support the verdict. *State v. Ballinger*, 110 Ariz. 422, 520 P.2d 294 (1974). Appellant complains that the evidence was insubstantial because the record reflects inconsistencies in the testimony of the state's witnesses and because the character of the witnesses rendered their testimony unreliable. We find there was substantial testimony, if believed, tending to connect appellant with the crimes charged. The credibility and weight to be given a witness' testimony are exclusively for the jury. *State v. Pieck*, 111 Ariz. 318, 529 P.2d 217 (1974). Furthermore, evidence is no less substantial simply because testimony is conflicting. *State v. Ballinger*, supra.

Affirmed.

HATHAWAY and RICHMOND, JJ., concur.