Filed 6/9/22  P. v. Galafate CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F081563 |
| Plaintiff and Respondent, | (Kern Super. Ct. No. SC036346B) |
| v. | |
| LENY PETERSON GALAFATE, | **OPINION** |
| Defendant and Appellant. | |

## THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Before Hill, P. J., Levy, J. and Poochigian, J.

## INTRODUCTION

In 1989, appellant Leny Peterson Galafate and her then-husband, codefendant Roman Galafate III,[1] were convicted after a joint jury trial of count 1, first degree premeditated murder, with the special circumstance that the murder was intentional and carried out for financial gain; and count 2, conspiracy to commit murder for financial gain. They were both sentenced to life in prison without the possibility of parole for count 1, with a stayed term of 25 years to life for count 2. In 1991, this court affirmed defendants' convictions and sentences on appeal. Thereafter, both defendants filed numerous writ petitions seeking postjudgment relief that were denied by the superior court and this court.

The instant appeal involves Leny's petition for resentencing pursuant to Penal Code[2] section 1170.95, filed in 2019. Her petition alleged she was entitled to relief because she was not the actual killer, and her murder conviction was based on the felony-murder rule and/or the natural and probable consequences doctrine. The superior court appointed counsel and the parties submitted briefing. The court summarily denied the petition without holding a hearing.

In this appeal, Leny asserts the superior court improperly relied on this court's prior opinion to summarily deny her petition without a hearing, this court's prior opinion is likely unreliable, and she made a prima facie case for relief because the instructions allowed the jury to convict of murder her based on an imputed malice theory. We affirm.

## FACTS[3]

In the mid-1980's, defendants Roman Galafate (Roman) and his then-wife, Leny Petersen Galafate (Leny), resided with family members in Delano, California. Roman

---

[1] Given their identical last names, we will refer to appellant as "Leny" and the codefendant as "Roman."

[2] All further statutory citations are to the Penal Code unless otherwise indicated.

[3] Prior to briefing being filed in this appeal, Leny filed a motion for this court to augment the instant appellate record with (1) the complete reporter's transcript from

was an agent for Midland National Life Insurance Company (Midland National) and had an office in the MGM Professional Building in Delano. On September 9, 1985, defendants filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of California. The court discharged their debts pursuant to chapter 7 of the Federal Bankruptcy Code on February 5, 1986.

Defendants maintained close ties with members of their extended family, including Reny and Violeta Petersen. Reny Petersen was Leny's uncle, her father's brother. Leny regularly visited Violeta Petersen, her aunt by marriage, and was godmother of Reny and Violeta's minor son, Chris. Roman wrote insurance policies for various family members, including a $75,000 life insurance policy on Violeta Petersen in October 1985. That policy named her husband, Reny Petersen, as the beneficiary of the proceeds.

Approximately two weeks after the defendants received their discharge in bankruptcy, Roman processed an application for a $250,000 insurance policy on the life of Violeta Petersen. The application was dated February 18, 1986, and named "Leny

defendants' 1989 joint jury trial; (2) all pleadings, minute orders, jury instructions, jury notes, and verdict forms from the 1989 trial; (3) this court's nonpublished opinion, filed in 1991, that affirmed defendants' convictions and sentences; and (4) all documents and orders relating to Leny's prior habeas petitions. This court granted the motion.

Thereafter, the instant appellate record was augmented to include the pleadings, minute orders, printed jury instructions, and verdict forms from defendant's joint jury trial in 1989; this court's 1991 opinion that affirmed defendants' convictions and sentences; and defendants' postjudgment habeas petitions, that were denied.

In response to this court's augmentation order, the court supervisor for the Superior Court of Kern County filed a declaration that the reporter's transcripts for the 1989 jury trial were for dates past the statutory requirements to maintain reporter's notes and were no longer available.

The following factual summary is based on the facts as stated in this court's 1991 opinion that affirmed defendants' convictions on direct appeal, that was augmented as part of the instant appellate record. (*People v. Galafate et al.* (Apr. 8, 1991, F012067) [nonpub. opn.].) As will be explained below, we provide these facts for background purposes but do not rely on these facts in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

3.

Petersen" as beneficiary of the proceeds. Leny Petersen was Leny's maiden name. Leny signed her aunt's name on the policy application. Although Violeta's address was 20857 Francis Drive in Richgrove (Tulare County), the application bore Roman's post office box number in Delano.

Sometime prior to Sunday, February 23, 1986, Roman purchased an $83 money order from the Miracle Market at 1643 Cecil Avenue in Delano. Store manager, Pete Medrano, required customers to pay cash for money orders but did not require presentation of identification. According to Medrano, the store personnel generally filled in the amount of the money order, and the customer completed the rest of the information. Although Roman admitted purchasing the $83 money order, the face of the instrument indicated Violeta Petersen purchased it on February 18, 1986.

Roman transmitted the completed application and money order to Midland National in Sioux Falls, South Dakota. Midland National received the documents sometime between 6:15 a.m. on Friday, February 21, 1986, and 6:15 a.m. on Monday, February 24, 1986.[4]

**Discovery of Mrs. Petersen's Body**

Reny Petersen last saw his 34-year-old wife, Violeta, at their Richgrove home on Saturday morning, February 22, 1986. Violeta had received her paycheck the day before and was carrying $500 in cash. She planned to pay bills that day.

At 6:50 p.m. that day, Martha Salinas was traveling northbound on Browning Road from McFarland to Delano. At the intersection of Browning and Pond Roads, Salinas saw a large car speeding westbound on Pond Road. The car went through a stop

_____

[4] The Sioux Falls office was not open on Saturday, February 22, 1986, or Sunday, February 23, 1986. The parties stipulated there was mail pickup at 6:15 a.m. on Friday, February 21, and the next pickup was at 6:15 a.m. on Monday, February 24. The insurance application was collected during the latter pickup. United States Postal Service Supervisor Martoria Sherman testified it would take a minimum of two days, and probably three, for a letter mailed in Delano to reach Sioux Falls.

4.

sign, swayed, and almost crashed into Salinas's car.  Salinas saw the male driver pull the car over and park.  A few minutes after 7:00 p.m., Salinas returned by the same route and saw a body in the roadway in the vicinity of where the car had been parked.  The body had not been there earlier.  Salinas stayed at the scene until law enforcement officers arrived.

Kern County sheriff's deputies were dispatched to the scene and found the body of a fully clothed female lying on her back.  A blueish-colored tongue protruded from the victim's mouth.  The victim's sweater was pulled up over her head and a distinctive bruise surrounded her neck.  Officers found a purse, jewelry, and several bank books scattered about the victim as well as loose fibers on her face and body.  A wallet contained a driver's license in the name of Violeta Bacena Petersen.  The officers did not find any money in either the purse or the wallet.

That same evening, Reny Petersen stopped by his father's grave on his way home from work.  Sometime after 6:00 p.m., Reny realized Violeta was gone.  After unsuccessfully attempting to locate her, Reny filed a missing person report with Tulare County Sheriff's Detective Charles Denchfield around 10:30 p.m.  Denchfield relayed the information to his communications unit, the Delano Police Department, and the Kern County Sheriff's Department.

Around midnight, Kern County sheriff's detectives advised Reny his wife was dead.  Detective Sergeant Craig Fraley took carpet samples from Reny Petersen's home several days later.

**The Autopsy and Fiber Evidence**

On February 24, 1986, Dr. Armand L. Dollinger, a forensic pathologist, performed an autopsy on the five-foot three-inch, 102-pound body of Violeta Petersen.
Dr. Dollinger concluded Violeta died by asphyxiation caused by ligature strangulation sometime prior to 2:00 p.m. on February 22, 1986.  The ligature could have been a rope or cord.  The particularly prominent mark of the neck wound demonstrated considerable

5.

force was used to hold the ligature. Dr. Dollinger testified death by ligature strangulation would have taken several minutes. The right hyoid, a small bone in the throat, was fractured. Aside from the wounds to the neck, the victim had bruises on the back of the head, over the left eye, on the cheeks, and on the left wrist. The livor mortis (color from blood settling to the lower portion of the body), facial petechial hemorrhaging (breakage of small vessels), and flattening of the face showed the victim had been face down for at least two to six hours after death.

James A. Malouf, a Kern County coroner's investigator, concluded the victim must have been killed elsewhere, placed face down for a time, and later left face up on Browning Road. The victim's pants were wet, and her panty shield was soaked. However, there was no evidence of sexual assault. Dr. Dollinger said urination is a frequent occurrence during death by ligature strangulation.

During the autopsy, Kern County criminalist Bernadetta Rickard collected trace evidence and took biological samples for analysis. She recovered fibers from the victim's neck wounds, body sheet, mouth, and hair. Rickard testified these fibers were collected before the body was disrobed. However, the fiber taken from the victim's mouth was recovered much later than the ones taken from the body sheet. Further, the envelope containing the mouth fiber did not specifically state it had been recovered before the disrobing of the victim. The recovered fibers were various colors, including green, red, black, and multicolored. There were several red fibers but no green fibers in the neck wounds. There were one or two green fibers, and various multicolored fibers in the mouth and on the tongue. Rickard found one green fiber on a lock of hair, another green fiber on another portion of the victim's hair, and at least two green fibers on the body sheet. Overall, the fibers were primarily green.

**Further Investigation**

On the date of the autopsy, Roman telephoned Midland National in Sioux Falls and reported Violeta Petersen had died on February 22. Roman requested instructions on

completing a claim and also inquired whether Midland National had received the victim's most recent policy application. Roman told Midland National personnel the application had been filled out the preceding Tuesday or Wednesday. He reported there were two policies – one for $75,000 and one for $250,000. Roman said the victim had been so pleased with the first policy that she wanted a second policy. Donald Lemke, Midland National Vice President of Claims, testified no policy was ever issued on the $250,000 application.

On February 26, 1986, Kern County sheriff's officers found Violeta's brown Honda Civic at the Sundance Inn, 405 Cecil Avenue, in Delano. The vehicle had been parked at the motel for a couple of days. The driver's seat had been adjusted to accommodate a driver taller than Violeta. The car was very clean and even the decedent's fingerprints could not be found on the vehicle. Law enforcement personnel unsuccessfully attempted to identify a print on the sun visor.

Sergeant Fraley took carpet samples from the motel. On March 18, 1986, Kern County criminalist Gregory Laskowski conducted a fiber analysis on the material recovered from the victim's body. Laskowski concluded those fibers did not come from the carpet in the Petersen residence or the Sundance Inn.

**Defendants' Statements and Conduct**

On March 18, 1986, Roman telephoned Donald Lemke at the Midland National office in Sioux Falls and advised that "Leny Petersen" was his wife. Lemke questioned why the victim used the name of Petersen instead of Galafate in the beneficiary designation. Lemke noted Leny used the name Leny P. Galafate when she applied for status as an authorized agent with Midland National on October 22, 1985. Roman promised to send Lemke information on the usage of Leny's maiden name.

On March 24, 1986, Lemke received a letter dated March 18, 1986, from Roman. However, the letter did not explain why the name "Leny Petersen" was used in the beneficiary designation. Lemke sent Roman a letter dated April 1, 1986, explaining what

7.

needed to be done to submit a claim regarding the $250,000 policy application. On April 7, 1986, Midland National received a $250,000 claim dated April 4, 1986, and signed "L. Petersen."

Earlier in March 1986, Midland National retained Donald Lake of Equifax Services to investigate the questionable claim. Lake obtained a statement from Leny Galafate on April 8, 1986. Leny said she learned of Violeta's death when her Uncle Reny telephoned her late in the evening of February 22 or early morning of February 23. On April 14, 1986, Lake telephoned Kern County Sheriff's Detective Craig Fraley, the primary investigator assigned to the Violeta Petersen homicide case. Fraley immediately telephoned Donald Lemke in South Dakota and obtained several documents, including applications for insurance policies on Violeta's life.

On April 18, 1986, Donald Lake interviewed Roman in his Delano office and obtained a signed statement from him. Roman said Violeta took out a $75,000 insurance policy in October 1985 and designated her husband, Reny, as the beneficiary. Roman said Violeta decided to purchase a second, larger policy after making a number of visits to his office. Violeta also mentioned she was considering changing the beneficiary on the $75,000 policy. Violeta frequently visited her niece, Leny, at Roman's insurance office. During these Friday visits, Violeta often spoke with Roman about acquiring another policy.[5]

However, it was not until a week before her death that Violeta actually applied for the policy. Roman told Lake he and Violeta were alone when the policy application was completed. Violeta's son, Chris, was in another room of the office suite until the "tail end" of the transaction. Roman was under the impression Violeta did not want Reny to know about the second policy. Roman said Violeta gave him cash to pay the premium because her checkbook was "kind of fouled up." Roman claimed he had taken the money

---

[5] Reny Petersen stated his wife had not been interested in insurance at all because she believed it was like a curse.

8.

to Presidio Savings and Loan in Delano on Saturday, February 15, 1986, but it was closed. He obtained a money order from the bank on Monday, February 17, 1986, and mailed the money order and application to Midland National on the same day.

On May 8, 1986, Sergeant Fraley conducted a consensual interview of Roman at his Delano office. Roman claimed he had last seen Violeta on the evening of Friday, February 21, 1986, at his insurance office. Roman admitted selling a $75,000 insurance policy to Violeta in 1985. A short time later, Violeta "started questioning" Roman about a $250,000 life insurance policy. Roman said Violeta also "attempted to change" the primary beneficiary on the $75,000 policy from her husband, Reny, to her niece, Leny. Roman further claimed he sold Violeta the $250,000 insurance policy one week before her death, and she had signed the application for it. Violeta gave Roman about $80 in cash so he could purchase a money order for the policy. Roman acknowledged sending the application to Midland National. Roman maintained Violeta wanted him to use a Richgrove post office box number as a return address. However, the application bore defendant Roman Galafate's post office box number. Roman informed Fraley about the pending insurance claim investigation and said he did not expect any payment to be made on the $250,000 policy application.

On June 2, 1986, Roman called Lemke for an update on the claims investigation. Lemke advised the insurance company was concerned about the authenticity of Violeta Petersen's signature on the $250,000 policy application. Roman said, "Right, well, you'll [sic] be sending a letter on that." On June 10, 1986, Lemke wrote Roman and repeated his concern about the signature on the policy application. Roman responded with a letter on his personal stationery, stating: "As addressed in your letter of June 10, 1986, which I have enclosed a copy, I will try to explain any unanswered questions you have directed to me." According to Roman, Violeta thought the $75,000 policy had lapsed and that Leny would apply for guardianship of Chris in the event of Violeta's demise. Roman indicated

9.

Leny had orally agreed to care for Violeta's child. Roman's letter did not answer Lemke's questions about the signature on the $250,000 policy application.

On June 11, 1986, Midland National mailed Reny Petersen a check for $76,362.50, representing the proceeds from Violeta's 1985 policy plus interest. Before Reny cashed the check, defendants engaged him in a discussion about the insurance money. Both defendants initially said he could not "get anything because the paper has been lapsed." Roman told Reny he would be in trouble because Violeta's policy had lapsed. Leny told her uncle he could not keep the money and said he should return it. Leny said she would accompany him to the bank so he could return the funds.

On June 23, 1986, Reny deposited $65,962.50 of the insurance money at Presidio Savings and Loan in Delano. Reny also put some of the insurance money in his Bank of America account.

On June 25, 1986, Leny drove her uncle to the Delano branch of Bank of America, and he withdrew $9,000 in cash from his account. Reny handed over all of this money to Leny while they were still in the bank. Reny also gave Leny another $1,000 in cash he had previously retained when he first deposited the insurance check.

On July 8, 1986, Leny and Reny went to the Presidio Savings and Loan, and Reny signed a document in Leny's presence. Reny believed that document would return the insurance proceeds to Midland National. In fact, Presidio Savings and Loan issued Reny a cashier's check in the sum of $66,000. On the same date, someone deposited $68,330.60 into an account at the main branch of Santa Barbara Savings in Bakersfield. The account was in the name of "Roman Galafate Insurance and Financial Services Center." Part of that deposit consisted of a $66,000 cashier's check issued by Presidio Savings and Loan to Reny B. Petersen. Santa Barbara Savings Supervisor Raul Holquin could not identify the person who deposited the cashier's check. However, Santa Barbara Savings's policy prohibited a third person from making a deposit on someone else's

10.

account. On the same date, someone withdrew $61,180 from Roman Galafate's account. Midland National never received any money back from the $75,000 Petersen claim.

On July 25, 1986, Donald Lemke wrote defendants and denied the $250,000 claim. The company did not issue a policy in response to the application.

On November 13, 1986, Detective Fraley interviewed Leny at her home after advising her of her rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Roman was present during a portion of the interview. Leny claimed Violeta was going to go shopping with Leny's mother on Saturday, February 22, 1986. Three times during the course of the interview, Leny denied signing the insurance application.[6] Leny provided Detective Fraley with four handwriting exemplars.

Detective Fraley submitted Leny's handwriting exemplars to Kern County Deputy Sheriff Cheryl Gottesman, an examiner of questioned documents. Deputy Gottesman examined Leny's exemplars, the signature on the $250,000 application, and the signatures on the credit cards issued to Violeta Petersen. Magnification of the signature on the application disclosed the letters had been carefully and individually formed, and later linked together. The style of subsequently connecting separate letters suggested a forgery.

On March 18, 1987, Deputy Gottesman reported the person who signed Violeta's name on the application was not the same person who had signed the credit cards. She further reported there was a strong similarity between the signature on the application and Leny Galafate's handwriting. However, Leny's exemplars were basically printed, and Deputy Gottesman lacked sufficient cursive writing to make a positive comparison.

**The Continued Investigation**

On September 23, 1987, Leny provided another handwriting exemplar for Deputy Gottesman's examination. In a report dated September 29, 1987, Deputy Gottesman

---

[6] The court cautioned the jury it could only consider Roman's statements to Detective Fraley against Roman, and Leny's statements to Detective Fraley against Leny.

11.

concluded the person who completed and signed the two sets of exemplars with the name Leny P. Galafate was the same person who had signed the name Violeta Petersen on the insurance application. Deputy Gottesman explained Leny's signature was consistently raised above the signature line on the exemplars in the same fashion as the signature on the insurance application.

On January 12, l988, Christopher Hillis, an investigator for the Kern County District Attorney's office, seized carpet samples from Roman's insurance office.[7] Hillis also noticed a large stain on the green carpeting. He returned later to cut out the stained carpet section for a urine analysis.

On February 11, 1988, Investigator Hillis delivered the carpet samples from Roman's office to Criminalist Laskowski. Laskowski determined the green carpeting in Roman's insurance office was "microscopically and chemically consistent" with the green fibers found on Violeta's body. Laskowski testified it was impossible to determine whether the green fibers came from the carpet in Roman's office because carpeting is manufactured in bulk and is widely distributed. Subsequent tests on the stained section of the carpet neither revealed nor ruled out the presence of urine.

On cross-examination, Criminalist Laskowski conceded there are several types of nylon fiber, and his test did not show whether or not the fibers recovered from the body were of the same type of nylon as that contained in Roman's office carpet. Assuming the fibers were recovered from the victim's back, mouth, and hair, the criminalist concluded the victim had "total body contact" with the carpet. In other words, she either had been wrapped up in the carpet or had been laying upon it. However, there was no evidence

---

[7] In 1986, Criminalist Gregory Laskowski concluded neither the carpet in the Petersen home nor the carpet at the Sundance Inn was similar to the green fibers removed from Violeta's body. No carpet samples were taken from Roman's office until 1988. The green carpeting in Roman's office had been installed prior to February 1986.

any of the fibers were recovered from the victim's back. Criminalist Laskowski also testified some of the mouth fibers could have come from the victim's clothing.

**Leny's Admissions that She Forged the Victim's Signature**

On March 9, 1988, Investigator Hillis spoke with Leny on the telephone to "give her an opportunity to clear up some inconsistencies," since she was suspected of forgery. The next day, Investigator Hillis and Assistant Chief Investigator Dwight Pendleton contacted Mrs. Galafate at her in-laws' home in Earlimart and asked her to come to the Delano police station for an interview. Leny requested an opportunity to contact her attorney, Heberto Sala, of Bakersfield. She eventually accompanied the investigators to the police station after they allegedly threatened to put her children in a shelter.

At the station, Leny acknowledged to Investigator Hillis that she had signed Violeta Petersen's name on the insurance application four days before Violeta's death. Leny claimed Violeta asked her to sign the document because her child was "acting up." Although Roman was present at the time, his back was turned, and he did not know Leny had signed the document. Investigator Hillis testified the Kern County District Attorney charged defendants with the murder of Violeta Petersen on March 23, 1988.

**The Defense**

The defendants did not testify. Family members attested to the close relationship between defendants and the Petersens. Leny was the godmother of the Petersens' son, Chris. Defense counsel argued the jury would have to believe Leny conspired to kill a friend and family member who trusted her. Counsel claimed Violeta sought a larger policy so Leny would be able to care for Chris.

Dr. Dollinger testified the victim died sometime prior to 2:00 p.m. on February 22, 1986. Leny's sister, Sol Petersen, lived with the defendants and testified they were at home the entire day of February 22, 1986. She said they slept in until noon, took showers and ate lunch, and then stayed at the house to watch television and do housework. Leny's younger sister, Joey Petersen, testified Leny felt ill after Violeta died.

13.

Defense counsel proffered alternative theories of the case during closing argument. First, counsel suggested the green fibers on Violeta's body might have come from clothes she regularly wore to Roman's insurance office. Second, counsel suggested a robbery for $500 as a possible motive for the crime. Third, counsel also suggested some sort of sordid affair led to Violeta's death. Counsel pointed out Violeta's car was discovered at a motel, her wedding band was found at home after the murder, and she was planning an extended trip to the Philippines without her husband. Fourth, counsel pointed out it made no sense for the defendants to kill Violeta before Midland National received the policy application in Sioux Falls. Finally, counsel argued it did not make sense to kill Violeta in the insurance office because the MGM Professional Building was located near the Delano police and fire stations.

Defense counsel also introduced evidence of defendants' good and kind character. Several defense witnesses testified defendants were not violent people.

## PROCEDURAL BACKGROUND[8]

On or about May 26, 1988, an information was filed in the Superior Court of Kern County charging Roman and Leny with count 1, first degree premeditated murder (§ 187, subd. (a), § 189), with the special circumstance that the murder was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)); and count 2, conspiracy to commit murder for financial gain (former § 182.1).

---

[8] The following procedural background is based on the pleadings, minute orders, printed jury instructions, and verdict forms from defendants' 1989 jury trial, this court's 1991 opinion that affirmed defendants' convictions and sentences, and Leny's prior habeas petitions, as augmented to the instant appellate record on Leny's motion. (§ 1170.95, subd. (d)(3).)

14.

**Jury Instructions**

The court instructed the jury on first and second degree murder, premeditation, and express and implied malice. The jury was also instructed on lesser included offense of voluntary manslaughter.

As we will further discuss below, the court instructed the jury with CALJIC No. 3.00, defining principals and aiders and abettors; and CALJIC No. 3.01 defining direct aiding and abetting. The jury was not instructed on any target or nontarget offenses as part of the aiding and abetting instructions.

The court instructed the jury with CALJIC Nos. 8.80 and 8.81.1 on the elements of the special circumstance of murder for financial gain as to count 1, murder.

As to count 2, conspiracy to commit murder, the jury was instructed with the requisite elements, including CALJIC Nos. 6.10, 6,11, and 6.23. The jury was not instructed on any target or nontarget offenses related to conspiracy, but only that defendants were charged with conspiracy to commit "first degree murder with the special circumstance of being an intentional murder for financial gain"

**Convictions**

On January 23, 1989, after a joint jury trial, both Roman and Leny were convicted of count 1, first degree premeditated murder, with the special circumstance found true; and count 2, conspiracy to commit murder for financial gain, with two overt acts found true.

**Sentencing**

After the verdicts, Leny filed a motion to strike the special circumstance because she had no criminal record. "It is true that no amount of incarceration will ever bring back the decedent. Nothing will ever give to [Leny] the loss of her nurturing years with her children. [¶] She is not a drug user nor addicted to alcohol. Except for this incident she is not a criminal." The prosecution filed opposition and asserted Leny's behavior

15.

was "even more reprehensible than [Roman]. She assisted in a plan which involved the cold-blooded murder of her aunt for money."

On March 23, 1989, the court denied the motion to strike the special circumstance, and defendants' motion for new trial.

The court sentenced both Roman and Leny to life without the possibility of parole for count 1, first degree murder with the special circumstance, and stayed the term of 25 years to life for count 2, conspiracy to commit murder.

**Defendants' Joint Direct Appeal**

Defendants filed a joint appeal with this court from their convictions and sentences. Roman filed a separate petition for writ of habeas corpus, and alleged ineffective assistance of counsel.

On April 8, 1991, this court filed the nonpublished opinion that affirmed defendants' convictions and sentences and denied Roman's writ petition. (*People v. Galafate et al.*, *supra*, F012067.)

This court rejected defendants' arguments that the trial court improperly engaged in ex parte communications with jurors and should have considered juror declarations. We also rejected their arguments that the expert improperly testified about the fiber evidence and the court should have instructed on attempted murder and theft as lesser included offenses. We held the prosecutor did not comment on Roman's invocation of his right to remain silent, the prior acts evidence was properly admitted, and the district attorney's office did not violate Leny's right to counsel.

As a separate issue, Leny argued there was insufficient evidence to support her conviction for first degree murder as an aider and abettor because "the prosecution offered three theories of liability: [she] could be found guilty as the perpetrator, as an aider and abettor, and as a conspirator." Leny further argued there was insufficient evidence she was the perpetrator; at most, she was guilty of attempted insurance fraud; the evidence "might have" shown Roman was the actual perpetrator; the evidence "did

16.

not shed any light" on Leny's participation; and her conviction for murder was based on "unsupportable speculation."

In rejecting Leny's arguments, this court reviewed culpability of perpetrators, aiders and abettors, and conspirators.

> "Conspiracy is not synonymous with aiding or abetting or participating. Conspiracy implies an agreement to commit a crime. Aiding and abetting requires actual participation in the act constituting the offense. [Citation.] To be an abettor the accused must have instigated or advised the commission of the crime or been present for the purpose of assisting in its commission. One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it. Moreover, the aider and abettor in a proper case is (1) guilty of the particular crime that to his knowledge his confederates are contem plating committing and (2) liable for the natural and reasonable or probable consequences of any act he knowingly aided or encouraged. Thus, the liability of an aider and abettor is vicarious. *Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.* [Citations.] A conspirator is criminally liable for acts done in furtherance and as a reasonable consequence of a conspiracy. A conspirator is not liable for the independent action of another coconspirator that is outside the common design. [Citation.]"

This court held Leny's murder conviction was supported by substantial evidence:

> "A review of the entire record reveals substantial evidence of defendant Leny Galafate's status as both an aider and abettor and a conspirator. The United States Bankruptcy Court for the Eastern District of California discharged Leny and her husband from their debts several weeks before the victim's murder. Two weeks after the discharge of the debts, Leny Galafate forged Violeta Petersen's signature on a $250,000 insurance policy application. The application named defendant, under her maiden name of Leny Petersen, as the policy beneficiary. Someone murdered Violeta Petersen within a week of the execution of the application. Defendant submitted a $250,000 claim, dated April 4, 1986, to Midland National …. Midland National received the claim and questioned both the use of defendant's maiden name and her signature on the application. On May 8, 1986, defendant's husband, Roman Galafate, told Sheriff Sergeant Craig Fraley there was an insurance company investigation of the $250,000 claim and he did not expect any payment on it. In June 1986, defendant

17.

advised her uncle, Reny Peterson, to return the proceeds of a $75,000 insurance policy on his deceased wife's life. Defendant accompanied Reny Peterson to the bank on two separate occasions. On June 25, 1986, defendant extracted $10,000 in cash from Reny Peterson. On July 8, defendant took Reny Peterson to the Presideo Savings and Loan and obtained a cashier's check for $66,000. That check was deposited to defendant Roman Galafate's bank account the same day. On three occasions, defendant falsely denied signing the policy application. Several years later defendant recalled she had signed the application a few days prior to the victim's death. However, defendant's husband, Roman Galafate, previously asserted only he and Violeta Peterson had been present at the time the insurance application was completed. The People properly note [Leny's] actions fully supported the jury's determination she conspired to commit murder for financial gain. As a coconspirator, she was liable for the victim's murder regardless of whether she personally committed or assisted in the strangulation.

"The People also point out defendant aided and abetted her husband in the murder of Violeta Peterson. The aider and abettor's liability is vicarious. If his or her acts are undertaken with the intent that the actual perpetrator's purpose be facilitated, he or she is a principal and liable for the commission of the offense. [Citation.] The People argue defendant Leny Galafate clearly facilitated the commission of the crime. She forged Violeta Petersen's signature on the life insurance application, submitted a $250,000 claim to the Midland National …, advised her uncle, Reny Petersen, she should return the proceeds of the $75,000 insurance policy, and ultimately extracted $76,000 from her uncle and deposited the money in her husband bank account. [¶] Thus, there is substantial evidence in this record that defendant Leny Galafate was culpable as both an aider and abettor and a conspirator."

We also addressed defendants' arguments about the two overt acts found true as to count 2, conspiracy to commit murder: (1) Roman purchased a money order for $83 from Miracle Market in Delano; and (2) Roman and Leny obtained money from an insurance policy, the beneficiary of which was Reny Peterson, by means of false pretenses. We agreed with defendants that the second overt act was improperly alleged and should not have been found true, because it was based on defendants' acts after the murder. "[T]he object of the conspiracy charged in Count II is the substantive crime of murder," and the second overt act, based on defrauding Reny Peterson, occurred after the

18.

murder and could not be an overt act. However, we held the error was harmless and it did not require the reversal of defendants' convictions.

> "Defendants do not challenge the correctness of the finding as to overt act No. 1, nor, in our view, would such a challenge stand. Only one overt act need be alleged and proved to support the conspiracy conviction, even though other overt acts not alleged may be given in evidence. [Citation.] Moreover, evidence of how defendants obtained the proceeds of the $75,000 insurance policy from Reny Peterson was clearly relevant and admissible as to the murder count as well as the conspiracy count whether or not the trial court struck overt act No. 2."

We rejected Leny's separate argument that the error involving the second overt act required reversal of her murder conviction. Leny asserted the prosecution relied upon alternate theories "embodied in overt acts No. 1 and No. 2, and it cannot be shown upon which ground the jury based on the verdict of guilty." We disagreed and held: "[W]here as here a conspiracy is charged, it is the agreement itself which constitutes a punishable conspiracy and the overt act merely establishes the legal existence of a criminal conspiracy. Only one overt act need be proven and found true."

Defendants filed a petition for rehearing with this court, which was denied. Defendants also filed a petition for review with the California Supreme Court, and that was also denied.

**Writ Petitions[9]**

Both defendants filed numerous postjudgment writ petitions challenging their convictions. In 1987 and 1989, defendants filed writ petitions with this court that were denied (see cases Nos. F028784, F030002). In 1997, defendants filed a joint petition for writ of habeas corpus in superior court; the petition was denied because defendants reasserted issues already raised and rejected in their direct appeal.

---

[9] Leny's motion to augment the instant appellate record expressly requested to include her prior habeas petitions.

19.

*Writ Petitions Challenging the Special Circumstance*

On July 17, 2013, Leny filed a petition for writ of habeas corpus in the superior court and argued the sentencing court improperly denied her motion to strike the special circumstance.

On October 23, 2013, the superior court denied Leny's petition, cited this court's opinion that affirmed the convictions, and found no reason to disturb the jury's verdicts and findings.

> "First, the jury found through deliberation and weighing all the evidence and applying the law before it, that petitioner was guilty of first degree murder with premeditation and deliberation. It also found petitioner committed the murder for financial gain. Where a jury so deliberated, life without possibility of parole is not cruel and unusual punishment ….
>
> "Assuming arguendo that petitioner should be found eligible for parole, the crime is so horrific that a finding of parole suitability is remote at best. … Mrs. Peterson was strangled without any excuse or justification. [Roman] took out a $250,000.00 life insurance policy on her life and had his wife forge her signature to ensure that their nephew Christopher receive the benefits in trust with petitioner being primary beneficiary rather than Rene Peterson [*sic*], petitioner's uncle.
>
> "Petitioner defrauded her uncle of $75,000.00 life insurance proceeds by false pretenses. Rene Peterson [*sic*] was in fact eligible for those funds. Instead, Petitioner conspired to and had knowledge that her husband Roman converted those proceeds by placing them in the bank to inure to the benefit of her husband and herself. Though Midland [National] … never paid out on the $250,000.00 life insurance policy does not change the scenario. Both her husband and petitioner … conspired to commit murder and did in fact murder Violeta Peterson for the life insurance proceeds. Petitioner used her position of trust to take advantage of Violeta Peterson, who before her demise was a family friend. These above-mentioned factors militate for the court not to exercise its discretion and disturb the sentence.
>
> "Though petitioner played a lesser role in these crimes than her husband, she is still liable for murder and conspiracy with special circumstances. She had knowledge of her husband's acts, and did nothing about it believing that the life insurance policies would take care of their

20.

financial problems after previously filing for bankruptcy in October 1985, and subsequent discharge of their debts."

### *Leny's Writ Petition and Claim of Factual Innocence*

On March 2, 2015, Leny filed another writ petition in superior court and claimed Roman, who was now her ex-husband after their 2009 divorce, had confessed to the murder and completely exonerated her, Leny was factually innocent, and his confession constituted newly discovered evidence of her innocence.

The petition was supported by Roman's declaration, dated December 12, 2014, that he had previously maintained his innocence, but now confessed that he murdered the victim on February 22, 1986. Roman declared that Mrs. Petersen unexpectedly appeared at his office that morning. Mrs. Petersen asked for help because she and her husband borrowed money using her parents' home as collateral, they were unable to pay the loan, and the home was about to go into foreclosure. Roman declared the victim was in a panic and asked for his help. She wanted him to cancel the large insurance policies she had purchased and refund the money so she could pay the outstanding loans. Roman said he could not give her a refund. She asked Roman for a loan, and he refused.

Roman declared Mrs. Petersen became angry and began shouting at him. He told her to leave. She became "even angrier and began to strike me with her hands and fists. This angered me and I overacted without thinking. I took the sweater that she wrapped around her shoulders and choked her with it just to shut her up and stop her flailing. It was not my intention to kill her; I only wanted to muffle her shouting. But, I ended up strangling her to death. It was a spontaneous spur of the moment act. I had never previously planned to kill Leny's aunt. And it wasn't my intention to 'kill' her when I choked her with her own sweater."[10]

---

[10] According to this court's 1991 opinion, the pathologist testified at trial that Mrs. Peterson died by asphyxiation caused by ligature strangulation, the ligature could have been a rope or cord, the particularly prominent mark of the neck wound demonstrated considerable force was used to hold the ligature, and death by ligature strangulation

After he killed Mrs. Petersen, he put her body in his office's private restroom, drove her car to the motel and left it there, and walked back to his office. He put her body in his car and dumped it on the road.

Roman declared Leny did not know he was going to kill her aunt because it was a spontaneous incident, they never planned anything, Leny did not know "until now" that he killed Mrs. Petersen, and he finally confessed to clear his conscience.

On June 2, 2015, the superior court denied Leny's writ petition that was based on Roman's alleged confession, cited to this court's 1991 opinion, and found Roman's declaration unreliable and self-serving.

> "[Roman] has nothing to lose by confessing since he cannot suffer any greater punishment. Though confessing his involvement in Violeta Peterson's [*sic*] murder may clear his conscience, it does very little if anything to clear petitioner of culpability. It does not exonerate [Leny] because there is still an abundance of circumstantial evidence linking [Leny] to her aunt's murder. Where such circumstantial evidence exists, a confession by a co-defendant is not enough to sustain a claim of innocence….

> "… The circumstantial evidence establishes that petitioner and her husband conspired to commit murder and did in fact murder Violeta Peterson [*sic*] for the life insurance proceeds. Though petitioner may have played a lesser role in the actual murder, this does not absolve her of culpability. She had knowledge of her husband's acts, and did nothing about it believing that the life insurance policies would take care of their financial problems after previously filing for bankruptcy in October 1985.

> "[Leny's supporting declaration] is also self-serving in that it virtually mirrors that of her ex-husband. It mentions nothing about forging of a life insurance policy and deposit of funds which did not belong to the couple in their bank account. All these above-mentioned factors along with

---

would have taken several minutes. Roman's declaration asserts Mrs. Petersen bought the insurance policies and fails to mention anything about Leny's admission that she forged Mrs. Petersen's signature on the insurance policy.

22.

the circumstantial evidence not only provide a motive to murder Violeta Peterson but also to link the petitioner to the murder."[11]

## SENATE BILL NOS. 1437 & 775

The instant appeal is from the denial of Leny's petition filed in 2019, for resentencing of her murder conviction pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437).

---

[11] According to this court's records, Leny filed a writ petition with this court in 2016, also based on Roman's declaration that allegedly exonerated her, and asserted his declaration constituted newly discovered evidence of her actual innocence (*In re Leny Petersen Galafate on Habeas Corpus*, May 27, 2016, F073373). This court relied on our 1991 opinion and denied the petition because Roman's declaration was undermined by the record. "First, the Declaration asserts that the victim was killed by strangling her with her sweater. This assertion is inconsistent with the type of wound described in the nonpublished appellate opinion in *People v. Galafate* [citation] (Opinion), which could have been made with 'a rope or cord.' Second, the Opinion also states that the strangulation required 'considerable force' that had to be applied for 'several minutes,' which supports an inference that the killing was intentional contrary to the assertions in the Declaration.

"Third, the Declaration also does not mention or explain the other injuries to the victim. More importantly, the Declaration does not undermine the facts linking petitioner to the killing. [Citation.] The Opinion notes that petitioner confessed that she signed the victim's name on an insurance application for $250,000 four days before the victim's death and petitioner was the beneficiary. On the application, petitioner signed her name, 'Leny Petersen,' instead of her married name, Leny Galafate, which creates an inference that there was an intent to mislead the insurance company. Roman was asked by an insurance agent to explain the discrepancy in petitioner's name on the application. He did not provide an explanation at that time or in his Declaration. In April 1986, the insurance company received a claim for $250,000, which was signed '"L. Petersen."' The Declaration does not attempt to explain petitioner's conduct in submitting the claim or persuading the victim's husband to give her the insurance proceeds from the victim's life insurance policy."

Thereafter, Leny filed a petition in the United States District Court, again based on Roman's declaration. This petition did not challenge the facts stated in this court's 1991 opinion, and instead attempted to explain her prior admissions about forging the victim's signature by claiming she acted under Roman's influence. The district court denied the petition and held "the continuing evolution of [Leny's] claim of actual innocence is clearly influenced by the deficiencies perceived by the state courts," and her attempt to "adapt the declarations to enhance their credibility has the opposite effect." (*Galafate v. Adams* (E.D. Cal., December 29, 2017) 2017 WL 6740811.)

Senate Bill 1437 became effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)[12]

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.'

---

[12] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

[Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957.) " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' " (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in

'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.) When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis, supra*, 11 Cal.5th at p. 968.)

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.) "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Id.* at p. 971.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972, fn. omitted.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818, if the court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022 (2020–2021 Reg. Sess.) (Stats. 2021, ch. 551, § 1) (Senate Bill 775). As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id*. at subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid*.) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid*.)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (§ 1170.95, subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion.* However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove,

28.

beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

## LENY'S SECTION 1170.95 PETITION

On September 5, 2019, Leny filed a section 1170.95 petition in the superior court for resentencing on her conviction for first degree premeditated murder with the special circumstance. Leny filed the petition in pro. per. and requested appointment of counsel.

The petition was supported by Leny's declaration, signed under penalty of perjury, where she checked boxes on a preprinted form that she was entitled to resentencing under section 1170.95 because a complaint or information was filed against her that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, she was convicted of first or second degree pursuant to the felony-murder rule or the natural and probable consequences doctrine; and she could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189 because she was not the actual killer, she did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of first degree murder; and she was not a major participant and did not act with reckless indifference.

On September 13, 2019, the court appointed counsel for Leny.

**The People's Opposition**

On January 13, 2020, the People filed opposition that included a factual statement that may have been based on either the 1989 probation report or this court's 1991 opinion; it did not include the opinion as a supporting exhibit.

The People argued Leny was convicted of first degree murder with the special circumstance "under a straight-up aiding and abetting theory based on a conspiracy to murder Victim for financial gain," she was also charged and convicted of conspiracy to

commit murder, there were no underlying felonies alleged, and the jury found the special circumstance true, that both defendants acted with the intent to kill.[13]

**Leny's Reply**

On May 26, 2020, Leny, represented by counsel, filed a reply to the People's opposition. The reply included a lengthy factual summary that stated it was "derived" from this court's 1991 opinion. Leny summarized the provisions of section 1170.95, and argued she made a prima facie showing of eligibility for resentencing.

**The Court's Denial of the Petition**

On August 10, 2020, the trial court summarily denied Leny's section 1170.95 petition without conducting a hearing or making findings as to why it did not issue an order to show cause.

## DISCUSSION

**I.      The Court's Summary Denial of the Petition**

Leny argues the court improperly denied her petition without conducting a hearing or explaining the reasons for denying the petition, it is not clear what documents or records the court relied on, and the court failed to explain whether "it was deciding if [Leny] had made a prima facie case for relief or whether it was deciding the prosecution had met its burden to prove beyond a reasonable doubt that [she] could be convicted of murder under the current versions of … sections 188 and 189."

Leny further contends that to the extent the superior court relied on this court's 1991 opinion, it was not permitted to examine the record of conviction to make factual findings at the prima facie stage to refute the allegations in her petition, and her petition

---

[13] On October 2, 2019, the People filed a motion to dismiss the petition because Senate Bill 1437 and section 1170.95 were unconstitutional. On October 4, 2019, Leny filed opposition to the constitutional challenge. On May 12, 2020, the court denied the People's motion to dismiss.

was facially sufficient to establish a prima facie case since she was never alleged to be the actual killer.

In this case, the court summarily denied Leny's petition, and declined to issue an order to show cause, before *Lewis* was decided and section 1170.95 was amended by Senate Bill 775. However, the statutory amendments are applicable to this case since it is not yet final on appeal. (See, e.g., *People v. Porter* (2022) 73 Cal.App.5th 644, 652; *People v. Vieira* (2005) 35 Cal.4th 264, 306; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306–309.)

In any event, the superior court complied with the amendments to section 1170.95, subdivisions (b) and (c) by appointing counsel and having the parties brief the issue at the prima facie stage. The court, however, did not conduct a hearing on the prima facie determination, or give a statement of reasons why it decided not to issue an order to show cause, as required by section 1170.95, subdivision (c). It is also not clear whether the court improperly denied the petition by engaging in premature factfinding based on the factual statements in the People's opposition, which appears to be either from the 1989 probation report or this court's 1991 opinion; or the factual statement in Leny's reply, which stated it was derived from this court's 1991 opinion. (*Lewis, supra*, 11 Cal.5th at pp. 971–972; § 1170.95, subd. (c).)

The opinion in defendants' direct appeal was not before the superior court but augmented to the instant record on Leny's motion, and it is part of the record of conviction that may be considered to determine whether the petitioner has made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.) However, the role of the appellate opinion is circumscribed. The factual summary contained in an appellate opinion is not considered admissible evidence regarding a petitioner's resentencing eligibility (§ 1170.95, subd. (d)(3)), and the court may not engage in factfinding based on the appellate opinion at the prima facie stage (*Lewis, supra*, 11 Cal.5th at p. 972).

The trial court erroneously denied Leny's section 1170.95 petition without holding a hearing, issuing a statement of reasons when it declined to issue an order to show cause, and possibly engaging in premature factfinding at the prima facie stage. (§ 1170.95, subd. (c).) However, we may affirm the denial of the petition if petitioner was not prejudiced by the statutory errors in this case. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent the statutory error, her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *People v. Watson, supra,* 46 Cal.2d at p. 836.) The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis,* at p. 966.)

We thus turn to the portions of the record before this court from Leny's 1989 trial that may be considered at the prima facie stage to determine if the court's errors under section 1170.95 were not prejudicial when it summarily denied her petition.[14]

---

[14] As a separate matter on what part of the record may be reviewed at the prima facie stage, Leny cites the declaration from the superior court, that the reporter's transcripts from defendants' joint jury trial in 1989 are no longer available, and states that "[b]ecause of these limitations, [she] does not agree that the trial facts articulated in the [section] 1170.95 record *completely reflect the evidence proved at trial*," and this court's 1991 opinion "*may not be particularly reliable*" because that factual statement would have been composed "in the light most favorable to the prosecution." Leny further states that since appellate counsel "does not have access to the trial transcripts, she has no basis at this point for challenging the statement of facts in the prior appellate opinion, but she in no way intends to waive her right to do so in the future should the transcripts become available."

This court filed the opinion that affirmed defendants' convictions on direct appeal in 1991. Immediately thereafter, Leny filed a petition for rehearing with this court that was denied, and then filed a petition for review with the California Supreme Court, that was also denied; there is no indication this court amended or corrected the opinion in any way as a result of those petitions.

As summarized above, the instant appellate record was augmented to include Leny's previous writ petitions that challenged the validity of her convictions. These

32.

## II.    The Instructions

Leny acknowledges the instant appellate record was augmented to include the jury instructions given at defendants' joint jury trial in 1989, but asserts those instructions were confusing, raise the possibility that she was convicted of murder based on imputed malice, and it cannot be determined whether the jury found she had the intent to kill to support a finding she failed to make a prima facie showing of eligibility for resentencing under section 1170.95.

---

petitions were filed closer in time to her 1989 jury trial, when the reporter's transcripts may have still been available.  Leny's writ petitions were repeatedly denied, and the courts relied on this court's 1991 opinion to find her allegations and eventual claim of actual innocence were undermined by the trial evidence.  The record does not show that Leny filed any successive writ petitions that alleged her prior petitions were improperly denied because this court's 1991 opinion misstated, omitted, or misrepresented the evidence introduced at defendants' trial that resulted in her convictions, or the factual statement in that opinion was not "reliable."

In Leny's pleadings filed in support of the instant section 1170.95 petition, there were similarly no allegations that anything contained in this court's 1991 opinion was unreliable or misleading.  Indeed, Leny's reply to the People's opposition included a factual statement taken from this court's 1991 opinion, without any reservations or assertions that the factual statement was not reliable or accurate.

In this appeal, however, Leny asserted for the first time that factual statements in the 1991 opinion may not be "reliable," without offering any further explanations or supporting declarations about possible errors or omissions, aside from the well-recognized presumption that an appellate court reviews the facts in the light most favorable to the judgment, and cites the superior court clerk's recent declaration that the reporter's transcripts from defendants' 1989 trial are no longer available.

As noted above, in considering a section 1170.95 petition at the prima facie stage, the court may not make factual findings based on a prior appellate opinion.  (§ 1170.95, subd. (d)(3); *Lewis, supra*, 11 Cal.5th at p. 972.)

As to Leny's assertions about the "reliability" of this court's 1991 opinion, and her discussions about the absence of any "litigation bar" to raising issues in her section 1170.95 petition, we decline to further address these contentions on the merits because, as will be explained below, the record in this appeal contains the pleadings, jury instructions, and verdict forms from defendants' joint jury trial, that will resolve the issues raised in Leny's petition and demonstrate she is not entitled to section 1170.95 relief as a matter of law.

The court may rely on jury instructions, which are part of the record of conviction, to make the prima facie determination, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*, *supra*, 11 Cal.5th 952.)

As will be explained, we find the allegations, instructions, and true finding on the special circumstance establishes that the jury did not convict her of first degree premeditated murder based on any imputed malice theories because it found she had the intent to kill, and that Leny is ineligible for resentencing under section 1170.95 as a matter of law.

### The Special Circumstance

The information charged both defendants with count 1, first degree premeditated murder (§ 187, subd. (a), § 189), with the special circumstance that the murder was "intentional and carried out for financial gain," within the meaning of section 190.2, subdivision (a)(1). The court instructed the jury with CALJIC No. 8.80 (1984 revision) on the special circumstance of murder for financial gain:

> "If you find the defendant[s] in this case guilty of murder in the first degree, you must then determine if murder was committed under the following special circumstance: the murder was intentional and carried out for financial gain.

> "A special circumstance must be proved beyond a reasonable doubt.

> "If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find it is not true.

> "If defendants, or either of them, was an aider and abettor *but not the actual killer*, it must be proved beyond a reasonable doubt that *he intended to aid in the killing of a human being* before you are permitted to find the

34.

alleged special circumstance of that first degree murder to be true as to that defendant.

"You must decide separately as to each of the defendants as to the existence or nonexistence of the special circumstance charged in this case. If you cannot agree upon your finding as to both defendants but can agree as to one of them, you must make your finding as to the one upon which you do agree…."

The jury also received CALJIC No. 8.81.1:

"To find that the special circumstance, referred to in these instructions as murder for financial gain, is true, each of the following facts must be proved:

"1. *That the murder was intentional*, and

"2. That it was carried out for financial gain." (Italics added.)

Defendants were convicted of first degree premeditated murder and the financial gain special circumstance was found true.

"Under section 190.2, subdivision (a)(1), a defendant is subject to the special circumstance if the 'murder was intentional and carried out for financial gain.' Even if the defendant is 'not the actual killer,' if that defendant 'with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree,' he or she is also subject to this special circumstance. (§ 190.2, subd. (c).) 'Reading the two provisions together it is clear that one who intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment.' (*People v. Freeman* [1987] 193 Cal.App.3d [337,] 339 [construing 1978 version of § 190.2]; see *People v. Padilla* (1995) 11 Cal.4th 891, 933.)" (*People v. Fayed* (2020) 9 Cal.5th 147, 201–202.)

"[B]efore defendant could be found subject to the financial gain special circumstance as an accomplice, the jury was required to find that defendant had the intent to kill. [Citation.]" (*People v. Padilla, supra*, 11 Cal.4th at p. 933.) "[I]f the defendant

is guilty as an aider and abetter, he must be proved to have acted with intent to kill before any special circumstance (with the exception of a prior murder conviction) can be found true." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1142, superseded by statute as stated in *People v. Mil* (2012) 53 Cal.4th 400, 408–409.)

Pursuant to section 1170.95, a petitioner is ineligible for resentencing if he or she was the actual killer, acted with the intent to kill or malice aforethought, or was a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile, supra*, 10 Cal.5th at p. 842.)

In enacting and amending section 1170.95, "the Legislature did not specify that a defendant with a special circumstance finding for the administration of poison (§ 190.2, subd. (a)(19)) or for killing while the defendant was an active participant in a criminal street gang (*id*. at subd. (a)(22)) is ineligible for relief. But both of those special circumstances require that the defendant intentionally killed the victim (see § 190.2, subds. (a)(19) & (22)), and a court would be correct to summarily deny a petition in such a case because the defendant could not make a prima facie claim that he was entitled to relief." (*People v. Allison* (2020) 55 Cal.App.5th 449, 460.) The financial gain special circumstance similarly requires the jury to find defendant had the intent to kill the victim. (*People v. Fayed, supra*, 9 Cal.5th at pp. 201–202.)

In this case, the jury found true the financial gain special circumstance pursuant to section 190.2, subdivision (a)(1), based on instructions that required the jury to find either that Leny was the actual killer, or she intentionally aided and abetted the actual killer in the commission of the murder. (§ 190.2, subds. (a)(1), former subd. (b).) If the jury determined Leny was not the actual killer, the special circumstance instructions expressly required the jury to find she intentionally aided the actual killer in the commission of first degree murder. Leny does not suggest how these instrutions would

have allowed the jury to find that an individual could intentionally aid and abet an actual killer in the commission of first degree murder without also intending to kill.

The true finding on the special circumstance therefore establishes the jury made the findings necessary to show an intent to kill for her conviction of first degree premeditated murder under the law as amended by Senate Bill 1437. Leny is thus ineligible for resentencing as a matter of law, and she was not prejudiced by the court's summary denial of her petition. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

## III. Leny's Instructional Arguments

Leny asserts that despite the special circumstance instructions, the rest of the instructions were confusing and permitted the jury to convict her of murder based on an imputed malice theory. Leny acknowledges she was not convicted under either the natural and probable consequences doctrine or the felony-murder rule but notes that after Senate Bill 775 amended section 1170.95, the statute provides for resentencing for persons convicted of "felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*…." (§ 1170.95, subd. (a), italics added.)

Leny argues that while she was separately charged and convicted of count 2, conspiracy to commit murder, the jury instructions "mimicking uncharged conspiracy instructions, and those instructions allowed jurors to apply imputed malice theories to the facts of this case," and she was convicted of murder based on instructions that "included uncharged conspiracy language such as that found to improperly allow imputation of malice in *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356."

In support of her imputed malice argument, Leny cites to the following instructions given at her trial: CALJIC No. 3.00 on principals and accomplices, and CALJIC Nos. 6.10, 6.11, and 6.22 on count 2, conspiracy. She argues the instructions allowed the jury to find the murder "was a probable and natural consequence of the plan *to commit insurance fraud* – the crime that prosecutors and the appellate opinion found

37.

easily provided as to [Leny] – and thus could have let jurors convict [her] of murder even if she did not personally harbor malice."

We thus review the other instructions given in this case.

***Aiding and Abetting Instructions***

"Generally, a defendant may be convicted of a crime either as a perpetrator or as an aider and abettor. [Citation.] An aider and abettor can be held liable for crimes that were intentionally aided and abetted (target offenses); an aider and abettor can also be held liable for any crimes that were not intended, but were reasonably foreseeable (nontarget offenses). [Citation.] Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the " ' "natural and probable consequences' doctrine." ' " (*In re Loza* (2018) 27 Cal.App.5th 797, 801; *People v. Williams* (2015) 61 Cal.4th 1244, 1268.)

Under the direct theory, the prosecution "must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 279.) "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*Gentile, supra*, 10 Cal.5th at p. 848.)

Under the indirect theory, where the offense that "the perpetrator actually commits is *different from the originally intended crime*, the natural and probable consequences doctrine limits liability to those offenses that are reasonably foreseeable consequences of the act originally aided and abetted." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108, italics added.) Under the natural and probable consequences theory as it previously applied to aiding and abetting murder, "a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.)

In this case, the court instructed the jury with CALJIC No. 3.00 (1987 revision), defining aiders and abettors.

"The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include:

"1. Those who directly and actively commit or attempt to commit the act constituting the crime, or

"2. Those who aid and abettor the commission or attempted commission of the crime.

"One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, *but he is also liable for the natural and probable consequences of any act that he knowingly and intentionally aided or encouraged.* It is for you, the jury, to determine whether the defendant is guilty of the crime allegedly contemplated, *and, if so, whether the crime charged was a natural and probable consequence of the criminal act knowingly and intentionally encouraged.*" (Italics added.)

CALJIC No 3.01 (1984 revision) defined direct aiding and abetting:

"A person aids and abets the commission or attempted commission of a crime when he or she (1) with knowledge of the unlawful purpose of the perpetrator and (2) *with the intent or purpose of committing, encouraging, or facilitating the commission of the offense*, by act or advice aids, promotes, encourages or instigates the commission of the crime." (Italics added.)

The jury was not instructed on any target or nontarget offenses as part of the aiding and abetting instructions.

CALJIC Nos. 3.00 and 3.01, as given, did not require the jury to find intent to kill. (*People v. Beeman* (1984) 35 Cal.3d 547, 560–563.) As explained above, however, that requirement was supplied by CALJIC No. 8.80 on the special circumstance. We presume the jury was capable of understanding and correlating the court's instructions. (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The jury was instructed that, if it determined Leny was not the actual killer,

it could find the special circumstance true only if she intentionally aided and abetted the actual killer in the commission of first degree premeditated murder.  It is not reasonably possible the jury would have ignored the requirement in CALJIC No. 8.80, that the special circumstance could be found true for count 1, first degree premeditated murder, only where the defendant intentionally aided and abetted in the commission of first degree murder, simply because that requirement was not reiterated in other, more general instructions.

As a separate matter, Leny cites the "equally guilty" language in the first paragraph of CALJIC No. 3.00 and argues that language has been rejected "because it fails to require proof that each defendant independently harbored the malice necessary to prove murder," based on the holding in *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*).

In *Nero*, a second degree murder case, the jury asked if it could find an aider and abettor guilty of a greater or lesser offense than the direct perpetrator.  (*Nero, supra*, 181 Cal.App.4 at p. 517.)  The trial court responded by rereading CALJIC No. 3.00, that " '[e]ach principal, regardless of the extent or manner of participation, is *equally guilty.*' "  (*Id.* at p. 519, italics added in original.)  The trial court also "told the jurors that an aider and abettor 'can bear no greater responsibility as far as the degree.' " (*Id.* at p. 520.)  *Nero* held the trial court committed prejudicial error because it precluded the jury from finding an aider and abettor guilty of a lesser offense than the perpetrator. (*Ibid.*)  By simply re-reading the "equally guilty" jury instruction, the trial court erroneously instructed the jury that the aider and abettor necessarily was guilty of the greater offense of second degree murder if the jury found the *perpetrator* was guilty of that offense.  (*Id.* at pp. 517–518.)  In reaching this holding, *Nero* believed that the "equally guilty" language could be misleading "even in unexceptional circumstances," and the court's decision to respond to the jury's questions by rereading CALJIC No. 3.00 resulted in the misinstructing the jury.  (*Nero*, at p. 518.)

While the phrase in CALCJIC No. 3.00 might be misleading and confusing in certain cases (*Nero*, *supra*, 181 Cal.App.4th at p. 518), the concerns addressed in *Nero* are undermined in the instant case by the special circumstance instructions that required a finding of an intent to kill.

### *The Conspiracy Instructions*

We next review the conspiracy instructions given for count 2, that charged both defendants with conspiracy to commit murder for financial gain. The court instructed the jury with CALJIC No. 6.23, that defendants were charged "with conspiracy to commit the following public offense[]: 1st degree murder with the special circumstance of being *an intentional murder* for financial gain." (Italics added.)

The court gave CALJIC No. 6.10 (1974 revision), that a conspiracy "is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of *murder in the 1st degree with the special circumstance of being an intentional murder for financial gain, and with the further specific intent to commit such offense*…." (Italics added.)

The jury also received CALJIC No. 6.11:

> "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy.

> "The act of one conspirator pursuant to or in furtherance of the common design of conspiracy is the act of all conspirators. *Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act*." (Italics added.)

The court gave CALJIC No. 6.22, that the jury had to determine as to each defendant whether that person was a member of the alleged conspiracy and whether that

person willfully, intentionally, and knowingly joined with any other or others in the alleged conspiracy.

The jury was not instructed on any other target or nontarget objects of the conspiracy, only that defendants were charged with conspiracy to commit "first degree murder with the special circumstance of being an intentional murder for financial gain."

While these instructions may have left open the possibility for petitioner to be convicted under a "natural consequences" theory subsequently eliminated by Senate Bill 1437, the record establishes the jury did not find Leny guilty of first degree premeditated murder under an imputed malice theory. "Under the natural and probable consequences theory of aiding and abetting a murder, a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez*, *supra*, 22 Cal.App.5th at p. 683.)

Under the conspiracy instructions in this case, however, *the target offense* was first degree murder because defendants were charged and convicted of *conspiracy to commit first degree murder*. "[A] conviction of conspiracy to commit murder requires a finding of intent to kill[.]" (*People v. Swain* (1996) 12 Cal.4th 593, 607.) " '[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641.) Under Leny's contrary argument, her assertion is still invalid because CALJIC No. 6.11 invited the jury to consider *murder* as a natural and probable consequence of a conspiracy to commit *murder*.

Moreover, as explained above, under the special circumstance instructions and finding, it is clear the jury convicted Leny of first degree premeditated murder by finding she had the intent to kill. She therefore is ineligible for resentencing as a matter of law. Any ambiguity in the instructions regarding aiding and abetting, murder, malice, or conspiracy does not undermine this conclusion.

42.

**IV.    "Uncharged Conspiracy" Theory of Murder Based on Imputed Malice**

Leny argues the instructions on aiding and abetting and conspiracy, discussed above, amounted to instructions on an "uncharged conspiracy" theory based on insurance fraud, and that permitted the jury to convict her of murder based on an imputed malice theory, as prohibited by *People v. Rivera, supra*, 234 Cal.App.4th 1350.

*"Uncharged Conspiracy"*

At the time of defendants' joint jury trial in 1989, it had been "long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.  [Citations.]  'Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." (*People v. Belmontes* (1988) 45 Cal.3d 744, 788–789, overruled on other grounds by *People v. Cortez* (2016) 63 Cal.4th 101, disapproved of by *People v. Doolin* (2009) 45 Cal.4th 390.)  If the prosecution relied on an uncharged conspiracy theory, the court had the duty to give instructions "defining a factual basis upon which, if proven, the acts and declarations of the several coconspirators would be competent evidence against all." (*People v. Ditson* (1962) 57 Cal.2d 415, 447; *People v. Belmontes, supra,* 45 Cal.3d at pp. 789–790.)

Evidence of an uncharged conspiracy remains relevant to prove criminal liability for acts of coconspirators.  (*People v. Valdez* (2012) 55 Cal.4th 82, 150.)  When the prosecution has not charged the crime of conspiracy but has introduced evidence of a conspiracy to prove liability for other offenses, the court has a sua sponte duty to instruct on conspiracy, along with CALCRIM No. 416, "Evidence of Uncharged Conspiracy." (*People v. Williams* (2008) 161 Cal.App.4th 705, 710; *People v. Smothers* (2021) 66 Cal.App.5th 829, 870.)

CALCRIM No. 416 was derived from earlier cases on uncharged conspiracy, namely *People v. Pike* (1962) 58 Cal.2d 70, and *People v. Ditson, supra*, 57 Cal.2d 415. (*People v. Williams, supra*, 161 Cal.App.4th at p. 709.) CALCRIM No. 416 sets forth four elements the prosecution must prove for an uncharged conspiracy: (1) that the defendant intended to agree and did agree with one or more other people to commit the target crime; (2) at the time of the agreement, the defendant and the other members of the conspiracy intended that one or more of them would commit the crime; (3) the defendant or the other member(s) of the conspiracy committed an overt act to accomplish the crime; and (4) the overt act was committed in California. (*People v. Smothers, supra*, 66 Cal.App.5th at p. 870 & fn. 4.)

### *Rivera*

Leny's argument that the instructions permitted the jury to convict her based on imputed malice and an "uncharged conspiracy" theory is based on *Rivera*, where the defendant was charged with first degree murder on the theory that he either directly aided and abetted a murder, or he was a member of an uncharged conspiracy, the natural and probable consequence of which was murder. (*People v. Rivera, supra*, 234 Cal.App.4th at p. 1355.) On the uncharged conspiracy theory of liability, the jury was instructed that it could convict the defendant of first degree murder if it found (1) he conspired to commit the target crimes of murder, attempted murder, robbery, and/or discharge of a firearm at an occupied vehicle, (2) a coconspirator committed the charged crime of first degree murder; and (3) the murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit. (*Ibid.*) The jury found the defendant guilty of first degree murder. (*Ibid.*)

*Rivera* relied on *People v. Chiu* (2014) 59 Cal.4th 155, superseded by statute as explained in *People v. Lewis, supra*, 11 Cal.5th 952, where the California Supreme Court held that an aider and abettor cannot be convicted of first degree murder under a natural and probable consequences theory, and the aider and abettor's liability for that crime

must be based on direct aiding principles. (*Rivera, supra*, 234 Cal.App.4th at pp. 1352, 1356, citing *Chiu, supra*, 59 Cal.4th at pp. 158–159.)

Based on *Chiu*, *Rivera* held uncharged conspiracy liability for first degree murder was analogous to aiding and abetting under the natural and probable consequences doctrine. (*Rivera, supra*, 234 Cal.App.4th at p. 1356.) *Rivera* held that it was error to instruct the jury that it could convict the defendant of first degree premeditated murder if it found that the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime. (*Id*. at pp. 1355–1356 & fn. 4.)

*Rivera* explained that under both aider and abettor and uncharged conspiracy theories, "the extension of liability to additional reasonably foreseeable offenses rests on the 'policy [that] conspirators and aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion,' " a theory that was rejected in *Chiu*. (*Rivera, supra*, 234 Cal.App.4th at p. 1356.) *Rivera* held the instructional error was prejudicial and required reversal of the murder conviction because the jury may have based the verdict on the natural and probable consequences doctrine. (*Id.* at pp. 1357–1358.)

### *Analysis*

Leny asserts the jury at her 1989 trial could have convicted her of murder based on an "uncharged" conspiracy theory based on insurance fraud as the target offense and murder as the nontarget offense. Leny argues the aiding and abetting and conspiracy instructions, "combined with the prosecution's insurance fraud motive theory, allowed jurors to impute malice to [Leny] from her participation in the insurance fraud. This concern is buttressed by the appellate opinion, which strongly suggests the prosecution had little evidence about how the decedent was killed or who killed her. It relied almost entirely on the fact that [Leny] and her husband had the motive to kill the decedent and in fact collected the insurance proceeds after she died…. This focus on [Leny's] role in the

45.

fraud rather than in the actual murder shows that it would have been easy for jurors to rely on the ambiguous instructions to find [her] guilty of murder based on her commission of fraud and her husband's commission of murder."

Leny's claim that she was convicted of murder based on an uncharged conspiracy theory is specious and refuted by the record that may be considered in making the prima facie determination. First, as discussed above, an uncharged conspiracy theory could have been relied on by the prosecution in 1989, but the court did not instruct the jury on any uncharged theories, target or nontarget crimes, or elements of insurance fraud. Second, Leny was charged in count 2 with conspiracy to commit murder, and the jury was instructed on that charge, as set forth above. Third, the jury was expressly instructed that Leny was charged in count 2 with conspiracy to commit a public offense, and that public offense was first degree murder and not some other target offense. In contrast to *Rivera*, the jury was not instructed that it could convict Leny of first degree murder based on the commission by either Roman or Leny of any other target offenses, including insurance fraud, or that the murder was the nontarget offense and could be the natural and probable consequence of the commission of that target offense.

Leny asserts the prosecution relied on evidence of insurance fraud as both the motive for the crime and the basis for the uncharged conspiracy theory that resulted in her conviction of murder based on imputed malice. The jury was instructed on CALJIC No. 2.51, that motive was not an element of the charged offenses of murder and conspiracy to commit murder and need not be shown, the jury could consider motive or lack of motive as a circumstance in this case, and the presence of motive "may tend to establish guilt." The jury was instructed about how to consider evidence of motive, and not that it was an element of the charged offenses.

While factual findings may not be made at the prima facie stage, we may review this court's 1991 opinion that affirmed defendants' convictions for the procedural history of the case. In that appeal, this court stated Leny argued there was insufficient evidence

to support her conviction for first degree murder because "the prosecution offered three theories of liability: [she] could be found guilty as the perpetrator, as an aider and abettor, and as a conspirator." Leny's appellate arguments did not challenge the prosecution's alleged reliance on an uncharged conspiracy theory.

Also, in the direct appeal, this court stated Leny argued there was insufficient evidence she was the perpetrator; at most, she was guilty of attempted insurance fraud; the evidence "might have" shown Roman was the actual perpetrator; the evidence "did not shed any light" on Leny's participation; and her conviction for murder was based on "unsupportable speculation." It appears Leny raised attempted insurance fraud on appeal as a possible lesser included offense but did not argue the jury could have relied on insurance fraud to convict her. This court held the trial court did not have a sua sponte duty to give any lesser included offenses, including attempted murder and theft.

Finally, Leny argues this court "cannot find that *the available record* conclusively excludes imputed malice as a theory of liability because neither the trial court nor this Court has any record of how the prosecution argued its case." (Italics added.) Leny argues this court's 1991 opinion and the jury instructions "support the inference that at trial, the prosecution *argued* that murder was a natural and probable consequence of the insurance fraud," she satisfied a prima facie showing for relief under section 1170.95, and an order to show cause should have been issued for an evidentiary hearing where the prosecution would have the burden of proof beyond a reasonable doubt. (Italics added.) Leny declared the alleged "confusion" created by the jury instructions cannot be resolved without reference to the prosecutor's closing argument, but the reporter's transcripts from her 1989 trial are not available and thus prevents this court "from determining whether and to what extent the trial prosecutor used these instructions *to ask jurors to infer [Leny's] malice from her husband's actions*," and this court must find the record of conviction "is too incomplete to find [Leny] ineligible for relief as a matter of law." (Italics added.)

The instant record refutes Leny's speculative attempts to question the jury's verdicts in this case. "Nothing in the language of section 1170.95 suggests it was intended to provide redress for allegedly erroneous prior factfinding. In particular, subdivision (a)(3) of section 1170.95 says nothing about erroneous prior findings or the possibility of proving contrary facts if given a second chance. Rather, it requires that the petitioner could not be convicted of murder *because of the changes to sections 188 and 189*, not *because a prior fact finder got the facts wrong*. The purpose of section 1170.95 is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved." (*People v. Allison*, *supra*, 55 Cal.App.5th at p. 461.)

As explained above, the court may rely on jury instructions, which are part of the record of conviction, to make the prima facie determination, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*People v. Soto, supra,* 51 Cal.App.5th at p. 1055.)

While some courts have interpreted the record of conviction for purposes of section 1170.95 to include the parties' closing arguments (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 935), it is elementary "that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) Leny's assertions that the prosecutor's closing argument might have undermined the jury instructions are refuted by those same instructions. At defendants' joint trial, the jury was instructed with CALJIC No. 1.02, that statements made by the attorneys during trial are not evidence; CALJIC No. 1.00, the jury must determine the facts from the evidence and no other source, the instructions explain the rules of law that apply to the case, and that the jury must accept and follow the rules of law as stated by the court; and CALJIC No. 1.01, that the jury had

48.

to consider all instructions as a whole, and regard each instruction in light of the other. We presume the jury followed the court's instructions (*People v. Johnson* (2022) 12 Cal.5th 544, 632), and there is no evidence in the procedural history of this case to refute this presumption.[15]

## V.     Conclusion

While the superior court failed to comply with section 1170.95 by summarily denying Leny's petition for resentencing without conducting a hearing or giving a statement of reasons why it was not issuing an order to show cause, the court's statutory violations are not prejudicial because Leny is ineligible for resentencing as a matter of law and her arguments to the contrary are meritless.  (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

## DISPOSITION

The superior court's order denying Leny's section 1170.95 petition is affirmed.

---

[15] During deliberations, the jury sent a note requesting to hear testimony about Roman's filing of the insurance claim, a question about the second overt act alleged for conspiracy and requesting assistance on how to fill out the verdict forms.